## FOGARTY, TRUSTEE IN BANKRUPTCY, *v.*
## UNITED STATES ET AL.

No. 6. Argued October 10, 1950.—Decided November 6, 1950.

*George M. Shkoler* argued the cause for petitioner. With him on the brief was *Henry S. Blum.*

*Oscar H. Davis* argued the cause for respondents. With him on the brief were *Solicitor General Perlman, Assistant Attorney General Morison, Samuel D. Slade* and *Hubert H. Margolies.*

*Raoul Berger* filed a brief for Howard Industries, Inc., as *amicus curiae,* supporting petitioner.

MR. JUSTICE MINTON delivered the opinion of the Court.

Petitioner, as trustee in bankruptcy of Inland Waterways, Inc., brought suit against the United States in the District Court of Minnesota, Fifth Division, under the War Contract Hardship Claims Act, popularly known as the Lucas Act, adopted August 7, 1946, 60 Stat. 902, 41 U. S. C. § 106 note, to recover $328,804.42 as losses alleged to have been sustained under certain contracts with the Navy Department for the production of war supplies and materials. On motion, summary judgment was entered for the United States. 80 F. Supp. 90. The Court of Appeals for the Eighth Circuit affirmed. 176 F. 2d 599. The suit turns on the interpretation and meaning to be ascribed to parts of the federal statute. Because we deemed resolution of the issues important, especially in view of asserted conflicts of decision in the interpretation of the statute among other federal courts, certiorari was granted. 339 U. S. 909.

The facts are not in dispute. Inland Waterways, financed by a Government guaranteed loan and advances under the contracts, entered into several contracts and supplemental agreements with the Navy Department, dated from September 18, 1941, to October 30, 1942, for the production of submarine chasers and plane rearming boats. Little progress had been made under the contracts when, on December 18, 1942, Inland Waterways filed a petition for reorganization in bankruptcy. Peti-

10

tioner was appointed trustee in bankruptcy. The United States filed claims in these proceedings based primarily on the unpaid balance of the loan plus interest, the cost of completing incomplete and defective work on ships delivered under the contracts, and decreased costs resulting from certain changes in the plans and specifications. Petitioner filed a counterclaim based primarily on payments due for progress in construction, overtime work, changes in plans and specifications and in wage rates involving increased cost to Inland Waterways, and the value of partially completed work requisitioned by the Government and the cost of its preservation. In support of his counterclaim, petitioner submitted to the bankruptcy court a petition for compensation for requisitioned property and a number of invoices purporting to bill the Navy Department for goods and services, all of which had previously been submitted to agencies of the Navy Department. On February 20, 1945, the Government and petitioner executed an agreement compromising these claims upon payment of some $16,000 by the United States to petitioner. The settlement agreement embodied a mutual general release in the broadest of terms and was approved by the bankruptcy court.

Petitioner initiated his efforts to secure relief under the Lucas Act on February 1, 1947, by filing a claim with the War Contracts Relief Board of the Navy Department based on the same matters which had been the subject of the compromise agreement effected some two years before in the bankruptcy proceedings. The same documents submitted in support of the counterclaim in the bankruptcy court, plus the counterclaim itself, were relied on by petitioner as showing a timely request for relief under the Lucas Act. The Board denied the claim. This suit followed under § 6 of the Lucas Act.

The only question decided by the Court of Appeals was that petitioner did not file with the Navy Department

on or before August 14, 1945, a "written request for relief" within the meaning of § 3 of the Lucas Act. We direct our attention to the correctness of that holding. Neither the Act nor the regulations of the President thereunder define the term. Pertinent parts of the Act are set forth in the margin.[1]

Shortly after Pearl Harbor, Congress granted to the President under § 201 of the First War Powers Act, 55 Stat. 838, 839, 50 U. S. C. App. § 611, the power to authorize Government agencies to make amendments and modifications of contracts for war supplies without regard to consideration if "such action would facilitate the prosecution of the war." Throughout the war, departments and agencies of the Government utilized the provisions of the Act and regulations thereunder to alleviate hardships encountered by war contractors in an economy geared to all-out war. After the termination of hostilities August 14, 1945, however, departments of the Government took different views of their powers under the Act and regula-

---

[1] SEC. 1. ". . . where work, supplies, or services have been furnished between September 16, 1940, and August 14, 1945, under a contract or subcontract, for any department or agency of the Government which prior to the latter date was authorized to enter into contracts and amendments or modifications of contracts under section 201 of the First War Powers Act, 1941 . . . such departments and agencies are hereby authorized, in accordance with regulations to be prescribed by the President . . . to consider, adjust, and settle equitable claims . . . for losses (not including diminution of anticipated profits) incurred between September 16, 1940, and August 14, 1945, without fault or negligence on their part in the performance of such contracts or subcontracts. . . .

"SEC. 2. (a) In arriving at a fair and equitable settlement of claims under this Act . . . .

"SEC. 3. Claims for losses shall not be considered unless filed with the department or agency concerned within six months after the date of approval of this Act, and shall be limited to losses with respect to which a written request for relief was filed with such department or agency on or before August 14, 1945 . . . ."

tions.  Some continued to exercise those powers, while others took the position that they were no longer applicable, since the war was over and contract modifications could not "facilitate the prosecution of the war."  This resulted in a disparity of treatment of claimants for the relief of the Act whose claims had been filed but not acted upon before August 14, 1945.  Whether such a contractor was to be accorded relief under the Act depended on the view the department with which he had contracted took of the Act.  This situation motivated congressional action.  See S. Rep. No. 1669, 79th Cong., 2d Sess.,[2] accompanying S. 1477, which became the Lucas Act.

This legislative history illuminates, for purposes of the question at hand, the relation of the First War Powers and the Lucas Acts.  The words of the Lucas Act itself shed further light on that subject.  Like § 201 of the First War Powers Act, the Lucas Act contemplates relief by grace and not in recognition of legal rights.  It speaks in § 1 of "equitable claims . . . for losses . . . in the performance of such contracts or subcontracts," and in § 2, of "fair and equitable settlement of claims."  Fur-

---

[2] "This bill, as amended, would afford financial relief to those contractors who suffered losses in the performance of war contracts in those cases where the claim would have received favorable consideration under the First War Powers Act and Executive Order No. 9001 if action had been taken by the Government prior to the capitulation of the Japanese Government.  However, upon the capitulation, the position was taken by certain departments and agencies of the Government involved, that no relief should be granted under the authority which then existed, unless the action was required in order to insure continued production necessary to meet post VJ-day requirements.  This was on the basis that the First War Powers Act was enacted to aid in the successful prosecution of the war and not as an aid to the contractors.  As a result, a number of claims which were in process at the time of the surrender of the Japanese Government, or which had not been presented prior to such time, were denied even though the facts in a particular case would have justified favorable action if such action had been taken prior to surrender."

ther, the Act limits the departments and agencies which may grant relief to those which were authorized to grant relief under the First War Powers Act. Finally, it limits claims upon which relief may be granted to those which had been presented "on or before August 14, 1945." As we have seen, that date was the one around which departments and agencies adopted the differing views of the First War Powers Act which necessitated congressional action.

In the light of the foregoing considerations and the relation of the Lucas Act to the First War Powers Act, we think Congress intended the term "written request for relief" to mean written notice presented prior to August 14, 1945, to an agency which was authorized to grant relief under § 201 of the First War Powers Act. Since there is no definition of the term in the Act or regulations, and since the legislative history of the Act does not show that any settled usage of the term was brought to the attention of Congress, no particular form of notice is required. But whatever the form of notice, it must be sufficient to apprise the agency that it was being asked to grant extralegal relief under the First War Powers Act for losses sustained in the performance of war contracts.

Petitioner, in attempting to establish an interpretation of the Lucas Act which would allow him to maintain this suit, has placed much reliance on events which occurred in Congress subsequent to its enactment. The second session of the Eighty-first Congress passed H. R. 3436, which was vetoed by the President. 96 Cong. Rec. 8291, 8658, 9602. Thereafter, Congress passed S. 3906, which failed of enactment over another veto of the President. 96 Cong. Rec. 12911, 14652. Petitioner's argument is that these bills and their legislative history show that Congress had a different intent in passing the Lucas Act than that attributed to it by its administrators and some of the courts. If there is anything in these subsequent

events at odds with our finding of the meaning of § 3, it would not supplant the contemporaneous intent of the Congress which enacted the Lucas Act. Cf. *United States* v. *Mine Workers,* 330 U. S. 258, 281–282.

We do not think that the documents relied on by petitioner come within the meaning of the term "written request for relief." Neither the counterclaim in the bankruptcy court, nor the petition for compensation for requisitioned property, nor the invoices for extras, sought relief as a matter of grace. They sought payment as a matter of right. The counterclaim demanded judgment of the bankruptcy court. The petition for requisitioned property and the invoices were legal claims for compensation under contract. As such, they constituted a basis for suit in court. See, *e. g.,* 28 U. S. C. § 1346. That petitioner himself thought of them as judicially cognizable claims is evidenced by the fact that he included them in the counterclaim filed with the bankruptcy court, which obviously had no jurisdiction to award any extra-legal relief under the First War Powers Act.

None of the documents relied on by petitioner was sufficient to apprise the Navy Department that it was being asked to accord relief under the First War Powers Act. We must therefore agree with the Court of Appeals that no "written request for relief" was filed, and, therefore, that recovery was not available to petitioner under the Lucas Act. We do not reach alternative questions. The judgment is

*Affirmed.*

MR. JUSTICE BLACK concurs in the result.