**HUMPHREY et al. v. UNITED STATES.**

No. 49031.

United States Court of Claims.

Decided Jan. 8, 1952.

John W. Gaskins, Washington, D. C., (Harold C. Hector and Wasson J. Wilson, Hammond, Ind., of counsel, King & King, Washington, D. C., on the brief), for plaintiffs.

Kendall M. Barnes, Washington, D. C., Holmes Baldridge, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

HOWELL, Judge.

This case arises under the War Contracts Hardship Claims Act, popularly called the Lucas Act, 60 Stat. 902, as amended by 62 Stat. 869, 992, 41 U.S.C.A. § 106 note. The defendant has moved for summary judgment on the ground that there is no genuine issue as to a necessary jurisdictional fact in that plaintiffs did not file a proper written request for the type of relief contemplated by the Lucas Act with a department of defendant prior to August 14, 1945.

The plaintiffs, a partnership, on November 8, 1943, entered into a subcontract to perform the lathing and plastering for $525,000 on Altgeld Gardens, a Chicago war housing project, which was under the direction of the National Housing Agency acting on behalf of the Federal Public Housing Authority. Plaintiffs' subcontract called for the application of three coats of plaster, a scratch coat, a brown coat, and a finish coat, to be applied according to Government specifications which were made a part of the subcontract.

In making their bid, plaintiffs contemplated applying the plaster by the "double back" method whereby the mechanics were able to retrace their steps with a minimum of delay and apply the brown coat to the scratch coat after the scratch coat.

had set sufficiently to permit the application, but before it was completely dry. On May 3, 1944, plaintiffs began their operations using the double back method which met with the approval of defendant's project engineer who accepted work done in this manner. However, on August 1, 1944, the business agent of the local plasterers' union, from which plaintiffs obtained their mechanics, elected to enforce a union rule requiring that plaster be applied by the "bone dry" method, whereby the scratch coat is permitted to dry completely before the brown coat is applied. Compliance with this rule meant that plaintiffs would not be able to proceed with the work with their prior continuity, that the production of each individual workman was considerably lessened, and that more materials would be required.

Plaintiffs immediately protested to the prime contractors and to the Project Engineer, stating that they would have to quit the job if forced to comply with the union demands, unless they were paid for the additional work and materials involved in compliance. Numerous conferences were held during August 1944, and when relief was not forthcoming, the prime contractor, on September 7, wrote the following letter of protest on plaintiffs' behalf to the Project Engineer:

"Reference is made to the controversy between representatives of the Plasterers' Union and our specifications relative to application of brown coat plastering with which you are well familiar.

"Every effort has been made by us to comply with the specifications but interference of the Union prevents our so doing. We have exhausted every possible means to work out this difficulty with the Union but have had no success.

"Our plastering subcontractor advises that due to the change in specifications for the application of brown plaster as demanded by the Local Plasterers' Union, additional expense has occurred and unless he is guaranteed reimbursement for this additional cost of performing work in accordance with the Union demands, he has no alternative but to stop all plastering operations.

"The additional cost incurred to date due to his being forced to abide by the Union demand of not browning until scratch coat is bone dry in lieu of applying the brown coat after the scratch has become sufficiently set as required by the specifications amounts to $10,000.00 and to complete the job under these conditions would involve an additional cost over and above that mentioned of $25,000.00.

"In order to avert stoppage of plastering work, it is imperative that we have your immediate reply."

The Project Engineer replied on September 13, 1944, rejecting plaintiffs' claim on the ground that the bone dry method of application was within the scope of the contract specifications. Thereafter, acting through their prime contractor, plaintiffs made three appeals from this decision, first to the contracting officer, then to the regional director of the Public Housing Authority, and finally to the head of the Department, predicating their argument on the grounds that the union's requirement entitled them to contractual relief either as a change in specifications within the meaning of Article 3 of the standard form Government contract, or as a changed condition within the meaning of Article 4. All of these appeals were denied because the Government felt that either method was within the scope of the specifications, although admittedly the bone dry method was a more stringent method of compliance.

Plaintiffs completed this subcontract at a total loss of $137,172.05. On January 22, 1947, plaintiffs filed a claim with the Federal Public Housing Authority for relief under the Lucas Act, which claim was amended on March 17, 1948, to set forth plaintiffs' *net loss* on all Government contracts of $117,993.44. This claim was denied on October 7, 1948, on several grounds, one of which was that plaintiffs had not made a written request for relief under the First War Powers Act, 50 U.S.C.A.Appendix, § 601 et seq., and therefore had not satisfied the requirement of Section 3 of the Lucas Act. Within six months thereafter plaintiffs applied to this court for relief from this decision under Section 6 of the Lucas Act.

The defendant contends that it is entitled to summary judgment as a matter of law because of plaintiffs' failure to satisfy a necessary jurisdictional fact in that all of the aforementioned requests by plaintiffs for relief from the union's decision were requests for contractual relief, and in no way asserted a claim for extra-legal relief under the First War Powers Act. Plaintiffs argue that their original letter of protest, quoted in full above, was sufficient to notify the Federal Public Housing Authority that they were requesting extra-legal relief as a matter of grace, and did not present a request for relief as a matter of contractual right. Plaintiffs further insist that the fact that this request was treated as one for contractual relief, and that the subsequent appeals were made on the basis of contractual relief, are not sufficient to bar them from now reasserting their claim for extra-legal relief contained in the original letter of protest.

■ Section 3 of the Lucas Act provides in part as follows: "Claims for losses * * * shall be limited to losses with respect to which a written request for relief was filed with such department or agency on or before August 14, 1945."

In Fogarty v. United States, 340 U.S. 8, 71 S.Ct. 5, 8, 95 L.Ed. 10, the Supreme Court concluded that the written request for relief referred to in Section 3 had to be: " * * * sufficient to apprise the agency that it was being asked to grant extra-legal relief under the First War Powers Act for losses sustained in the performance of war contracts."

However, as this court pointed out in McKenzie, Trustee v. United States, 96 F. Supp. 944, 119 Ct.Cl. 435, it is not necessary that the claim for relief state that the relief is sought under the First War Powers Act so long as the request is couched in terms of grace rather than in terms of right.

■ We think that the letter of September 7, 1944, was sufficient to notify the defendant that plaintiffs, as subcontractors, were seeking extra-legal relief from losses occurring in the performance of war contracts. This letter did not request relief as a matter of right because of any act of the Government resulting in a changed condition or in a change of specifications. Rather, relief was requested because of the demands of the Union, which relief, it seems to us, could have been forthcoming only as a matter of grace on the part of the Government. Also, while the letter did not state that plaintiffs were incurring losses, as such, it did state that plaintiffs were incurring substantial "additional costs" and unless they were guaranteed reimbursement for these amounts, they had no alternative but to stop plastering operations. Such language is sufficient to notify the contracting agency that a loss is being, or has been, incurred.

■ Nor do we think that plaintiffs are barred from reasserting this claim under the Lucas Act after having treated their claim in their various appeals as one for contractual relief. Plaintiffs first presented their claim as one arising under the contract only after the Government had denied the original claim for extra-legal relief on the ground that it did not create a situation where contract relief was called for. It was only natural for plaintiffs to pursue their appeals on the basis contained in the denial of the original request, i. e., as a claim for contractual relief. If this court were to deny plaintiffs an opportunity to present proof as to the validity of their claim for extra-legal relief under such circumstances, it would be acting in a manner foreign to the equitable purposes of the Lucas Act.

There is some indication from the defendant's exhibits that plaintiffs' losses may have been due to their negligence in not previously ascertaining whether or not the union rule requiring bone dry application of plaster was then being enforced in the Chicago area. However, we are not prepared to say on the present incomplete state of the record that such a conclusion is justified, and hence we leave this matter to proof.

It appearing to the court that plaintiffs have satisfied the jurisdictional requirements of the Lucas Act, the defendant's

motion for summary judgment must therefore be denied.

It is so ordered.

JONES, Chief Judge, and MADDEN, WHITAKER and LITTLETON, Judges, concur.