562

## SIMPSON et al. v. UNITED STATES.
### No. 49203.

United States Court of Claims.

Feb. 5, 1952.

William A. Carter, Jacksonville, Fla. (Stockton, Ulmer & Murchison, Jacksonville, Fla., on the brief), for the plaintiff.

Frank J. Keating, Washington, D. C., Holmes Baldridge, Asst. Atty. Gen., and Kendall M. Barnes, Washington, D. C., for the defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

HOWELL, Judge.

This suit is brought under the War Contracts Hardship Claims Act, known as the Lucas Act, 60 Stat. 902, as amended by 62 Stat. 869, 41 U.S.C.A. § 106 note, to recover of the United States $126,431.18 as losses alleged to have been sustained by plaintiffs in the performance of all contracts and subcontracts under which work, supplies or services were furnished defendant between October 6, 1942 and August 14, 1945.

The petition alleges that on August 24, 1943, plaintiffs entered into Contract No. C2ca2053 with Civil Aeronautics Administration of the Department of Commerce, a Government agency authorized by Executive Orders Nos. 9001 and 9116, 50 U.S. C.A.Appendix, § 611 note, to enter into contracts and amendments under Section 201 of the First War Powers Act of 1941, 50 U.S.C.A.Appendix, § 611; that pursuant to that contract plaintiffs furnished work, supplies and services until the contract was terminated on September 15, 1944; that during the performance of the contract, plaintiffs suffered losses without fault or negligence on their part, in the sum of $244,016.12; that on or about November 10, 1944, plaintiffs filed with the Civil Aeronautics Administration a written request for relief from the losses; that in response to such request for relief, the contracting officer determined that plaintiffs were entitled to an equitable adjustment for a portion of the losses claimed, in the amount of $92,355.24; that on August 6, 1945, the Assistant Secretary of Commerce, acting for the head of the department, determined that

plaintiffs were entitled to $74,441.10; that within six months after the date of approval of the Lucas Act, plaintiffs filed a claim for their losses with the Civil Aeronautics Administration; that on December 23, 1947, that agency denied plaintiffs' claim in its entirety upon the ground that plaintiffs had not filed written requests for relief with respect to the losses in question prior to August 14, 1945; that the amount claimed in this suit does not exceed the net loss of plaintiffs on all contracts and subcontracts held by them under which work, supplies or services were furnished to the Government between October 6, 1942 and August 14, 1945.

At a pretrial proceeding before Commissioner Herbert E. Gyles of this court, plaintiffs submitted the document, dated November 10, 1944, relied on by plaintiffs as their written request for relief from loss filed with the contracting agency prior to August 14, 1945. Plaintiffs also submitted the decision of the contracting officer denying their claim in part, plaintiffs' appeal from that decision, the decision of the head of the department affirming in part the decision of the contracting officer, plaintiffs' Lucas Act claim filed with the contracting agency, and the decision of the contracting agency denying such claim.

On the basis of the petition and the documents submitted by plaintiffs at the pretrial proceeding, defendant has moved for summary judgment on the ground that there is no genuine issue as to a necessary jurisdictional fact in that plaintiffs did not have on file with a department of defendant prior to August 14, 1945, a written request for relief within the meaning of the Lucas Act.

Plaintiffs have taken the position that the documents which are relied on as requests for relief filed with the contracting war agency prior to August 14, 1945, are requests for the sort of relief contemplated by the Lucas Act; that the amount of plaintiffs' losses has been finally ascertained and is undisputed, and that, accordingly, there remains no genuine issue as to any material fact. Plaintiffs have moved the court to enter summary judgment in their favor.

Section 1 of the Lucas Act provides in part, as follows: "Where work, supplies, or services have been furnished between September 16, 1940, and August 14, 1945, under a contract or subcontract, for any department or agency of the Government which prior to the latter date was authorized to enter into contracts and amendments or modifications of contracts under section 201 of the First War Powers Act, 1941 [50 U. S.C., Supp. IV, App., Sec. 611], such departments and agencies are hereby authorized, in accordance with regulations to be prescribed by the President * * * to consider, adjust, and settle equitable claims of contractors * * * for losses (not including diminution of anticipated profits) incurred between September 16, 1940, and August 14, 1945, without fault or negligence on their part in the performance of such contracts or subcontracts. * *"

Section 3 of the Lucas Act provides in part, as follows: "Claims for losses * * shall be limited to losses with respect to which a written request for relief was filed with such department or agency on or before August 14, 1945".

In the numerous cases that have arisen under the Lucas Act, it has been the Government's position that the expressions "equitable claims of contractors * * * for losses * * * incurred * * * without fault or negligence on their part in the performance of such contracts * * *" appearing in section 1, and "written request for relief" appearing in section 3, refer only to the sort of claims which Government agencies could have entertained under section 201 of the First War Powers Act, and not to claims which the Government was obligated by contract and law to pay. Section 201 of the First War Powers Act authorized certain Government contracting agencies to amend contracts without consideration when they could find as a fact that such action would further the prosecution of the war. The making of such a finding and the awarding of relief was solely within the discretion of the contracting agency. No contractor was "entitled," as a matter of law, to relief under that section of the act, and no appeal lay from the agency's failure or refusal to grant such relief. With the termination of the war in August 1945, contracting agencies

generally (with a few exceptions) believed that they could no longer make the finding of war necessity requisite to support their taking action under section 201. As a result, numerous contractors who had suffered losses not compensable under their contracts and whose plight was being given consideration under the gratuity provisions of the First War Powers Act, were left without any hope of relief. The Government contends that the Lucas Act was passed for the purpose of aiding those contractors alone, and only to the extent that relief as a matter of grace might have been afforded them had final action under the First War Powers Act been taken prior to August 14, 1945.

In the case of Fogarty v. United States, 340 U.S. 8, 71 S.Ct. 5, 95 L.Ed. 10, the United States Supreme Court had the following to say with respect to the sort of "relief" contemplated by Congress in enacting the Lucas Act: "* * * we think Congress intended the term 'written request for relief' to mean written notice presented prior to August 14, 1945, to an agency which was authorized to grant relief under § 201 of the First War Powers Act. Since there is no definition of the term in the Act or regulations, and since the legislative history of the Act does not show that any settled usage of the term was brought to the attention of Congress, no particular form of notice is required. But whatever the form of notice, it must be sufficient to apprise the agency that it was being asked to grant extra-legal relief under the First War Powers Act for losses sustained in the performance of war contracts." 340 U.S. at page 13, 71 S. Ct. at page 8.

In the Fogarty case, the claims relied upon by Fogarty, trustee in bankruptcy for Inland Waterways, Inc., were (1) claims for payments due the bankrupt under its contracts with the Navy Department, (2) claims for the value of partially completed plane rearming boats, materials and equipment for their construction which the Government had requisitioned, and (3) claims for expenses incurred by the bankrupt in conserving this property for the United States. These claims had all been presented by the trustee to the bankruptcy court and were settled by a compromise agreement approved by the bankruptcy court. Following the settlement, the trustee brought a suit under the Lucas Act and relied on the above three claims as written requests for relief from losses. The Circuit Court of Appeals, 8 Cir., 176 F.2d 599, pointed out first, that these claims were not presented to the contracting agency prior to August 14, 1945, and that, in any event, they were claims for which, if established, the United States was liable at law to the bankrupt, and for the recovery of which the bankrupt was entitled to maintain an action at law against the United States. "And they were so treated when finally adjudicated in the bankruptcy court. They are not 'equitable' claims within the meaning of the [Lucas] Act." 176 F.2d at page 603.

We shall now turn to the facts and circumstances underlying plaintiffs' written request for relief. From the pleadings and documents it appears that plaintiffs' contract with the Civil Aeronautics Administration was for the grading, draining, and seeding of the Titusville-Cocoa, Florida, Airport. The contract time was 130 calendar days with a provision that liquidated damages would be assessed at the rate of $750 a day for each day of delay. The contract also provided that plaintiffs must complete all work on one complete runway and turn it over to the paving contractor for paving within 60 calendar days after notice to proceed, with liquidated damages to be assessed at the rate of $750 a day for each day of delay on that portion of the contract. Notice to proceed was issued effective September 10, 1943, thus setting the completion date for the first runway as November 8, 1943, and for the entire job as January 17, 1944. Neither the first runway nor the entire grading job was completed within the contract time as extended, and on September 15, 1944, the contractor's right to proceed on all work was terminated. Liquidated damages were assessed in the amount of $201,750 for 269 days representing the combined delay for completion of the entire project and of the first runway.

On November 10, 1944, plaintiffs submitted a written claim to the contracting officer and it is this document which is relied on

by plaintiffs as constituting a request for extra-legal relief from losses incurred in the performance of the contract. The first part of plaintiffs' claim requested remission of all liquidated damages assessed on the grounds that defendant had waived its right to assess liquidated damages because of its election to terminate plaintiffs' right to proceed, and that the defendant was not entitled to liquidated damages in any event, because all the delays were caused either by acts of the Government or by unforeseeable circumstances within the meaning of Article 9 of plaintiffs' contract. The second part of plaintiffs' claim asserted the right to additional compensation in the amount of $441,877.33 for work done by plaintiffs and alleged to be outside the terms of the contract, of a character differing materially from the work indicated by the proposal, plans, and specifications on which the bid was made, and of a character not contemplated by either party at the time the contract was entered into.

The contractors' claims are broken down into four major classifications with respect to alleged excess costs, i. e., grading, drainage, stabilization, and clearing.

A number of circumstances are urged as causes of the excess grading costs. The plaintiffs claimed that in staking out the final grade of the air field, the Civil Aeronautics Administration engineers staked the field .69 feet lower than the elevations shown on the plans submitted to plaintiffs for bidding purposes and followed by plaintiffs in the construction of the field. As a result of this mistake, the contractors were required to excavate considerably more earth per acre than the quantity indicated on the plans and, correspondingly, in the case of each fill area indicated on the original plans, the capacity of such areas to receive excavated material was reduced. The balanced grading operation indicated by the original plans had to be abandoned and the excess excavated material disposed of by hauling it to distant points on the field. Plaintiffs' grading plans had to be revised.

Another circumstance resulting in further excess earth to be disposed of by long haul was said to be a mistake on the part of the Government in representing the shrinkage factor of the earth at the site to be 42.5 percent, whereas the true shrinkage factor was approximately 25 percent. By the time the mistake in staking the field was made and the true shrinkage factor discovered, plaintiffs had released their long-haul equipment, and because of the difficulty in reacquiring such equipment, plaintiffs were forced to use short-haul equipment with resulting delays and additional cost.

The revision of the plans after the grading operation had been substantially completed, caused the contractors to construct 6,800 lineal feet of additional berm. Under the terms of the contract all berm was to be paid for as grading. However, berm construction is a much more expensive operation than ordinary grading and the great increase in the quantity of berm work required resulted in a considerable increase in the contractors' costs.

Further excess costs are alleged to have resulted from the Government's delay in furnishing the contractors with revised plans, in shifting the contractors' operations from place to place all over the field in attempts to find locations for the surplus earth, and in the slowness of the Government engineers in setting grade stakes ahead of the contractors' work so that the grading operation could proceed with the maximum efficiency.

The contractors also claimed that the grading operation was rendered more expensive by the presence of surface ponds of water which were not indicated on the plans originally submitted to the contractors by the Government.

The contractors stated that the Government required them to backfill and remove certain spoil piles left by the excavation operations of the paving contractor despite the fact that the contract required that such backfilling be done by the paving contractor. Plaintiffs were not paid for such additional work.

Finally, the plaintiffs claimed that the plans and specifications contained no indication that rock excavation would be required and yet in the performance of the work the plaintiffs were actually required to excavate 3,500 cubic yards of rock for

which extra compensation should have been paid.

With respect to the additional cost of doing the drainage work, the plaintiffs cite three circumstances. The above-mentioned mistake in staking out the final grade of the field too low is said to have caused plaintiffs to lay drain pipe that much closer to the water level, and that in so doing, quantities of quicksand and water were encountered, requiring the construction of deeper ditches than contemplated, the excavation of quicksand, and the laying of pipes at certain points on timber trestles. The revised grading plans issued by the Government in January 1944, raising the grade some four feet at the Southwest and West ends of the field, caused the contractors to construct catchbasins of varying heights instead of at a standard height as contemplated in the original bid. Further additional cost in the drainage operation was said to be caused by the defendant's requirement that plaintiffs tear out certain drain pipe for inspection and later replace it. Plaintiffs maintained that this work should have been paid for as provided in Article 6(c)[1] of the contract.

With respect to excess stabilization costs, the plaintiffs claimed that although the Government had represented that approximately 15,500 tons of stabilizing material would be required on the job, the contractors were only permitted to furnish 5,248.3 tons. The contractors' unit price bid for stabilizing work was based on the Government's representation that 15,500 tons of this material would be used. The permitted use of only one-third of that quantity necessitated increased working, rolling, and watering at considerable additional expense to the contractors.

Plaintiffs claimed that the clearing operation was rendered more expensive because of the elimination by the Government of certain acreage from the contract. Plaintiffs urged that the areas eliminated would have required substantially less time, work, and expense to clear than did the average of the total acreage on which their unit price for clearing was based.

Finally, plaintiffs pointed out that their contract contemplated that muck would be obtained both from places on the site and from locations off the site. On that basis, plaintiffs had bid 50 cents per cubic yard for muck to be obtained on the field, and 60 cents for muck beyond the field. As performed, all the muck was obtained outside the limits of the field and plaintiffs felt that this constituted a change entitling them to an increase in the price of obtaining such muck.

In that portion of their claim relating to remission of liquidated damages because the delays were caused either by acts of the Government or by unforeseeable circumstances, plaintiffs advanced in general the same facts alleged as justification for increases in costs.

In pressing their claims at the administrative level, the contractors contended that the staking of the filed .69 feet lower than shown on the original plans, the revision of the plans by the Government raising the elevation of the field at the ends of the two runways, the construction of additional berm, the elimination of certain areas for clearing, the reduction in the amount of stabilizing material to be used, the order to backfill after excavation by the paving contractor, and the obtaining of all the muck from locations off the field, all constituted changes within the meaning of Article 3 of the contract so as to entitle plaintiffs to appropriate change orders and equitable adjustments increasing the amounts due under the contract, as well as extensions in the time required for its performance. Plaintiffs contended that the lowering of the final grade of the field caused the contractors to encounter subsurface conditions of a sort materially differing from those shown

---

1. Article 6(c) provided that the Government might require the contractor to remove or tear out work in order that an examination might be made of the same; that if the work was found to be defective in any material respect due to the fault of the contractor, the contractor must defray all expenses of the examination and of satisfactory reconstruction; that if the work was found to meet the requirements of the contract, the contractor should be paid the actual cost of labor and materials involved in the examination and replacement, plus 15 percent, and receive any extension of time made necessary by the additional work involved.

on the plans and specifications within the meaning of Article 4 of the contract; that further changed conditions within the meaning of that Article were represented by the encountering of rock to be excavated, the unexpectedly low shrinkage factor of the earth to be excavated, and the presence of surface ponds. Plaintiffs contended that they were entitled to modifications of their contract to provide for increases in cost and time resulting from such changed conditions. Other portions of the claims, as pointed out above, were based on Article 6 (c), Article 9, and on a paragraph in the specifications requiring that backfilling be done by the paving contractor.

In conclusion, the plaintiffs made the following statement: "It is submitted that, if any case ever demanded an equitable adjustment, this is such a case. It is not believed to be the policy of the Government to permit its contractors to suffer financial ruin in the performance of contracts because of conditions beyond their control and because of conditions for which the Government is responsible. In this case the Contractors were more than $50,000 lower than the next lowest bidder on the work as described in the proposal. Through no fault of the Contractors, the work actually required differed materially from that described in the proposal. In a diligent effort to achieve the results desired by the Government, the Contractors have incurred actual costs in a sum nearly double the total amount of their bid. These costs are reasonable costs for the performance of the work in the circumstances under which it had to be performed, as shown by the affidavit of an experienced and reliable contractor for similar work, hereto attached as Exhibit 27. The Contracting Officer should allow these costs plus a reasonable profit."

On the basis of plaintiffs' claim and the evidence submitted in support thereof, the contracting officer on April 16, 1945, rendered his decision allowing plaintiffs $92,-355.24 as additional compensation, and remitting a substantial portion of the liquidated damages previously assessed. The question whether the plaintiffs were entitled as a matter of law to complete remission of liquidated damages because the Government had elected to terminate the contract, was left to the Comptroller General.

The decisions of the contracting officer which were favorable to plaintiffs were on the basis that the facts presented by plaintiffs established that certain changes in the specifications and plans within the meaning Article 3, had been brought about by the Government increasing the cost of grading, drainage work and stabilization work, and that plaintiffs had encountered during the process of such work, subsurface and latent conditions at the site differing materially from those shown on the drawings and specifications and resulting in increased cost and time of performance within the meaning of Article 4. With respect to plaintiffs' clearing work claims, and certain items of their claims in the grading, drainage, and stabilization categories, the contracting officer found adversely to plaintiffs on the ground that the record before the contracting officer failed to establish the facts alleged by plaintiffs in their claims. For example, the contracting officer found that the Government had revised the plans and had mistakenly represented the shrinkage factor of the earth with the result that the average length of the haul was increased; that the Government had refused to allow plaintiffs to use the amount of stabilization material contemplated and thereby increased their costs; that unforeseen subsurface conditions were encountered increasing the cost of drainage work. On the other hand, the contracting officer found that the contractors had failed to establish facts showing unreasonable delay by the Government engineers in setting grade stakes ahead of the contractors' work, in furnishing revised plans for grading, or that the contractors' operations had been unreasonably shifted from place to place on the field. The contracting officer found that plaintiffs could have, upon inspection, found the presence of rock at the site; that the spoil piles which the contractors had to remove were at a spot where the plaintiffs themselves had been excavating and were therefore required to level off in a workmanlike manner; that the areas eliminated for clearing were *not* areas that were easier to clear

than the rest of the field, that the presence of surface ponds could have been ascertained by plaintiffs if they had made a reasonable inspection of the site prior to bidding, and that the Article 6(c) · inspection disclosed defective work.

On appeal to the head of the department, the contracting officer's decision was largely affirmed except for one item of excess cost which the head of the department felt should have been charged against the contractors, and the net amount allowed by the contracting officer under Articles 3 and 4 of the contract was reduced to $74,441.10.

In our opinion, all of the claims asserted in the document of November 10, 1944, relied on by plaintiffs as a written request for relief from losses within the meaning of the Lucas Act, were claims which, if completely established, would have entitled plaintiffs to relief under the terms of their contract. The plaintiffs were partially successful in establishing their right to contractual relief. In those instances where plaintiffs failed, it was not because the claims were not cognizable under the contract. It was because the contracting officer was not persuaded that the facts were as plaintiffs represented them, but rather were as represented by the Government's witnesses and records. We find nothing in the document of November 10, 1944, nor in the nature of the claims asserted which indicated that the only relief available would be relief as a matter of grace, and we do not see how such a document could have placed the Civil Aeronautics Administration upon notice that it was being asked to grant plaintiffs such extra-legal relief.

 Plaintiffs point to a sentence in the conclusion of their claim of November 10, 1944, which states: "It is submitted that, if any case ever demanded an equitable adjustment, this is such a case. * * "

Plaintiffs contend that the above statement is clearly a prayer for extra-legal relief and that the Government was therefore on notice that plaintiffs were making such a claim. Viewing the documents as a whole, that statement was, we think, obviously a request for the sort of equitable adjustments specifically referred to in Article 3 [2] of the contract and implicit in the terms of Article 4.[3] We believe it was intended as such by plaintiffs and so understood by the contracting officer. It is the nature of the claim embodied in the request for relief that determines whether or not the resulting loss is cognizable under the terms of the Lucas Act, and plaintiffs' claims, re-

2. Article 3. *Changes.*—The contracting officer may at any time, by a written order, and without notice to the sureties, make changes in the drawings and/or specifications of this contract and within the general scope thereof. If such changes cause an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. Any claim for adjustment under this article must be asserted within 10 days from the date the change is ordered: *Provided, however,* That the contracting officer, if he determines that the facts justify such action, may receive and consider, and with the approval of the head of the department or his duly authorized representative, adjust any such claim asserted at any time prior to the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made the dispute shall be determined as provided in Article 15 hereof. But nothing provided in this article shall excuse the contractor from proceeding with the prosecution of the work so changed.

3. Article 4. *Changed conditions.*—Should the contractor encounter, or the Government discover, during the progress of the work subsurface and/or latent conditions at the site materially differing from those shown on the drawings or indicated in the specifications, or unknown conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the plans and specifications, the attention of the contracting officer shall be called immediately to such conditions before they are disturbed. The contracting officer shall thereupon promptly investigate the conditions, and if he finds that they do so materially differ the contract shall, with the written approval of the head of the department or his duly authorized representative, be modified to provide for any increase or decrease of cost and/or difference in time resulting from such conditions.

gardless of how they may have chosen to characterize them, were clearly contract claims.

On the basis of all the documents and pleadings before us, we conclude that plaintiffs did not have on file with a department or agency of the Government prior to August 15, 1945, a request for relief within the meaning of the Lucas Act. Having failed to establish this necessary jurisdictional fact, plaintiffs' motion for summary judgment is denied, their petition is dismissed, and summary judgment will be entered in favor of defendant.

It is so ordered.

JONES, Chief Judge, and MADDEN, WHITAKER, and LITTLETON, Judges, concur.