MaddeN, Judge,
delivered the opinion of the court:
The plaintiff sues under Public Law 657, 60 Stat. 902, as amended, 41TJ. S. C. 106 note (1946 Ed. Supp. Y), known as *3 the Lucas Act. The suit is for the recovery of money allegedly lost without the plaintiff’s fault or negligence in the performance of its contract for the construction of the Green Mountain Dam, in Colorado, for the Government’s Bureau of Reclamation, in the Department of the Interior, during the years 1939-1943.
The Lucas Act requires that a claimant, in order to be eligible for relief under it, must have fulfilled certain prescribed procedural prerequisites. See Fogarty v. United States, 340 U. S. 8; Howard Industries Inc. v. United States, 113 C. Cls. 231. The plaintiff fulfilled these conditions. We have the case, then, on its legal and factual merits.
As shown by our findings, the project was a large one. The principal item of construction was the erection of an earth-filled dam approximately 1,300 feet long at its crest, with a maximum height of 270 feet above the bed of the river. Approximately three and one-half million cubic yards of earth were to be placed in the dam. The contract price was $4,226,206.20. The working season was short because of the severe winter weather. The plaintiff completed the contract within the contract period, as extended. The extensions amounted to only 46 days.
Performance of the contract was difficult and expensive. There were strikes in 1939. Beginning in 1941, the National Defense Program created shortages of labor, equipment, supplies and repair parts. Efficient methods of performing the work had to be discovered by experimentation. Differences arose between the parties as to the interpretation of the contract and its specifications. The plaintiff was losing money. The Department of the Interior had the power to increase the contract price, without consideration, under the First War Powers Act. An Amendatory Contract, dated as of April 1, 1942, was made increasing the contract price in an estimated amount of $584,308.66, and releasing the Government from all past and future claims for additional compensation.
The plaintiff’s losses continued and in August 1942, the plaintiff again requested relief under the First War Powers Act. Long after the completion of the contract in 1943, a second Amendatory Contract was entered into on June 1, *4 1945, dated as of November 30, 1942, whereby the plaintiff on July 26, 1945, received an additional sum of $244,608.02. The plaintiff again executed a full release of all claims relating to the contract.
The releases given by the plaintiff are not a bar to this suit. In denying the Government’s motion to dismiss the plaintiff’s petition, we so held. 113 C. Cls. 265. We held that Executive Order No. 9786, Sections 204 and 307 of which would have made the releases a bar, was, in that regard, invalid as in contradiction of the statute.
Our present question is whether certain items of expenditure by the plaintiff may be counted in determining its losses, and whether certain items of income of the plaintiff should be counted as offsets to reduce its losses.
One item of expenditure is $142,634.44 of interest which the plaintiff paid, largely to a Chicago bank, for money borrowed in connection with the performance of the contract. Section 1 of the Lucas Act authorizes the Government to consider, adjust, and settle equitable claims of contractors for losses incurred in performing Government contracts “in accordance with regulations to be prescribed by the President.” The President’s regulations are contained in Executive Order No. 9786 of October 5, 1946, 11 F. R. 11553. Section 101.11 of the Regulations defines the term “net loss” as “the amount by which the aggregate of the costs of performance under all contracts and subcontracts exceeds the aggregate of the contract prices under all contracts and subcontracts.” “Cost of performance” is defined in Section 101.7 of the Regulations as:
the reasonable and necessary cost to a contractor * * * of work, supplies or services furnished * * * pursuant to a contract or subcontract, determined in accordance with the accounting practices of the contractor * * * provided such practices accord with recognized commercial accounting practices. Such cost shall include to the extent reasonable and necessary, direct costs and a properly allocable proportion of indirect costs, but shall not include the following items: a. Interest on invested capital.
The interest here in question was charged by the plaintiff as an operating cost. That charge was in accordance with *5 recognized commercial accounting practice. The interest was paid on money borrowed for the prosecution of the project. We suppose that the expression, “invested capital” in the regulation, referred to a charge made by a contractor who in fact did not borrow money, but had and. used his own money to finance the project, so that the charge was of the nature of crediting interest to himself.
We recognize that, thus interpreted, the regulation discriminates somewhat in favor of the impecunious contractor who is obliged to borrow his working funds, and against the well financed contractor who operates with his own funds. But accounting practice makes the distinction, as does the regulation. We think the charge is a proper one.
The Government argues that interest on “invested capital” means any interest paid on any borrowed money, but we think the regulation could not have meant that. If that was what was meant, it would have been much easier to say so than to have used the expression, “invested capital,” which has provoked a controversy as to its meaning. Our decision in Waxman v. United States, 125 C. Cls. 464, discusses the interest question at length.
We discuss now the items of gain to the plaintiff which, the Government says, should be set off against the plaintiff’s losses on the project. On December 1,1942, a fire at the site of the work destroyed several pieces of the plaintiff’s equipment. The plaintiff was paid by its insurance carrier an amount which was $54,860.69 in excess of the depreciated book value of the equipment destroyed. The Government says that this amount should be set off against the plaintiff’s performance losses. It says that the events show that the plaintiff had, in its accounting, charged the operation with depreciation on its equipment which depreciation had not in fact occurred, since the property was, at the end, worth so much more than its depreciated book value.
On January 28, 1944, the plaintiff sold to an outside person a large quantity of equipment which had previously been used on the Green Mountain pro j ect. For this sale it received $290,409.01 more than the depreciated book value of the equipment. For the same reasons as in the fire insurance *6 situation, the Government urges that this amount should go to reduce the plaintiff’s losses on the project.
If a contractor, at the same time that it performed one or more Government contracts at an overall loss, made a profit from contracts which it had with private persons, that profit could not, of course, be set off against its losses on the Government contracts, for Lucas Act purposes. It would have no more relevance than would a profit made in speculation on the stock market or the commodities market. And so the sale of equipment formerly used on a Government contract, at a profit, would seem to have no Lucas Act connection with the Government contract. If in fact the rate of depreciation which the plaintiff charged on its equipment, in computing its losses on the Government contract, was unjustifiably high, it should be cut down to what is normal and usual. The Government does not seem to urge that it was, per se, abnormal or unusual. Certainly equipment used on such a project has some substantial depreciation, and if the market remained stable, would bring less after each period of use. If usual depreciation rates are. realistic, property depreciated on the basis of its cost price will not sell for substantially more than its depreciated value unless the market has gone up while the property was in use, or a particularly advantageous sale is made. But in either case, the profit above depreciated book value is not a profit made on a contract with the Government.
What we have said about the sale of equipment at a profit is applicable also to the fire insurance situation. In effect the plaintiff lost the equipment and received in return what an outside person, the insurance company, had promised to pay it in the event of a loss. The profit was not made on the Government contract, any more than it would have been if the equipment had been sold to an outside person at a profit.
On December 12, 1942, the plaintiff leased to an outside contracting company certain equipment which that company used to perform a contract with a private corporation for stripping the overburden from bauxite deposits in Arkansas. The plaintiff received rent off $258,052.02 from this transaction. The Government urges that this amount be deducted from the plaintiff’s losses. Our discussion above shows why *7 we think it should not be deducted. After the close of the 1942 working season at Green Mountain and before the lease of the equipment was made, the plaintiff spent $20,332.39 to put the equipment into good operating condition. These repairs were not made with a view to increasing the value of the equipment for sale or lease though, as it turned out, they must have had the effect of making it more available and valuable for the purposes of the lease. We think it is not right to apply the cost of these repairs to increase the plaintiff’s loss, when the repaired machines were not again used on the Government project.
The Government urges that it is, on the whole, inequitable to allow the plaintiff to recover. There were the two rather liberal increases granted the plaintiff under the First War Powers Act, each accompanied by a full release by the plaintiff of all past and future claims. There were the incidental profitable transactions engaged in by the plaintiff. As we see it, the Lucas Act is more in the nature of an act of Congressional generosity than of strict equity. It makes a legal obligation out of what Congress regarded as a moral one, and if its prerequisites are satisfied, the obligation arises.
Pursuant to Section 6 of the Lucas Act, 60 Stat. 902, as amended by 62 Stat. 869, 922, the Bureau of Reclamation, Department of the Interior, is directed to settle plaintiff’s claim in the amount of $507,500, in accordance with a stipulation by the parties.*
It is so ordered.
Howell, Judge, and Littleton, Judge, concur.

Amended January 6, 1954.