**MILWAUKEE SHIPBUILDING & ENGINEERING CO.**

v.

**UNITED STATES.**

No. 48888.

United States Court of Claims.

June 8, 1954.

Robert Sheriffs Moss, Washington, D. C., for plaintiff.

Edward L. Metzler, Washington, D. C., Warren E. Burger, Ass't. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

LITTLETON, Judge.

This is an action under the War Contract Hardship Claims Act, known as the Lucas Act, 60 Stat. 902, as amended, 62 Stat. 869, 992, 41 U.S.C.A. § 106 note, to recover the sum of $22,713.08, alleged to represent losses incurred by plaintiff without fault or negligence on its part in the performance of a contract with the Government for the construction and delivery of four aircraft rescue boats.

The issues presented are (1) whether or not plaintiff filed a proper "written request for relief" with respect to its losses within the meaning of section 3 of the Lucas Act, and (2) whether or not that portion of the Lucas Act restricting recoverable losses to those "incurred * * * without fault or negligence * * * in the performance of such contracts" precludes plaintiff's recovery.[1]

Defendant's motion to dismiss the petition on the ground that the petition and accompanying exhibits failed to establish that plaintiff had filed a proper written request for relief was overruled by the court. Milwaukee Engineering & Shipbuilding Co. v. U. S., 113 Ct.Cl. 276, 83 F.Supp. 348. Subsequently, the decision of the Supreme Court in Fogarty v. United States, 340 U.S. 8, 71 S.Ct. 5, 95 L.Ed. 10, was announced. Defendant requested the court to reexamine its decision in the light of the Fogarty case. We deem it unnecessary to do so. We hold, for the reasons hereafter given, that plaintiff is precluded from recovery by that portion of the Lucas Act restricting recovery to losses incurred without fault or negligence of the contractor.

In May of 1941, Roy L. Brecke and Milton Polland obtained an option to buy the boatbuilding business of Ferdinand Nimphius of South Milwaukee, Wisconsin, for $1,500, and agreed, should the option be exercised, to employ Nimphius at $100 per week for the duration of any contracts which might be obtained, plus 12½% of the net profits. On July 16, 1941, Articles of Incorporation were filed with the Secretary of State of the State of Wisconsin on behalf of plaintiff, with the authorized capital stock of plaintiff fixed at 500 shares of common stock of no par value. A short time thereafter, Brecke and Polland, as agents for plaintiff, agreed to employ Nimphius at $100 per week on government contracts, and Nimphius executed a bill of sale conveying his entire business to Brecke and Polland.

---

1. In its reply brief, plaintiff suggests that if its Lucas Act claim is invalid, it has a claim in the same amount for breach of contract. We do not consider this argument, which was not raised either by the pleadings or during the trial of the case.

At a meeting on August 2, 1941, Brecke became president, Polland became secretary-treasurer, and Mark McKee became vice president of plaintiff, and the value of plaintiff's stock was fixed at $50 per share. The promoters agreed to exchange the Nimphius business for $5,000 in corporate stock, and in exchange therefor 25 shares each were issued to Brecke, Polland, McKee, and Joseph Rothmeyer. Certificates for 100 shares each were issued to the four stockholders at that time.

In late July and early August of 1941, plaintiff, with no assets except the business acquired from Nimphius, advised the Department of the Navy that it had a total capitalization of $25,000, raw and/or finished materials with an average value of $14,000, annual sales of $35,000, and that it had taken over and reorganized the Nimphius Boat Company, added new capital, equipment, and personnel, and was in an excellent position to accept contracts on wooden vessels of various types 150 feet or less in length.

After a number of unsuccessful attempts to obtain government contracts, plaintiff, early in January 1942, submitted to the Navy Department a bid offering to construct two to ten twin-engine aircraft rescue boats within 90 days after the date of award of the contract. On January 29, 1942, plaintiff reduced its bid price to $17,180 per boat and again promised delivery within 90 days. Plaintiff received a notice of award of Navy contract 99019 on February 7, 1942, and on February 12 a formal contract bearing the same number was entered into for the construction and delivery of four 36' 6" aircraft rescue boats powered by Sterling engines, with spare parts, at a total contract price of $72,105.08, to be delivered within 90 days.

The contract specifications for the boats had originally called for matched pairs of Hall-Scott "Invader" engines, but as issued, provided that Sterling engines were to be furnished. The boats were to be constructed from Navy plans, and were to be 36' 6" in length, with beams 10' 7½".

The use of the larger and heavier Sterling engines necessitated a revision of the Navy's lines and offsets plan. On February 15, 1942, plaintiff was advised by wire that the boat lines were being altered and to await further instructions. A revised plan was prepared and forwarded to plaintiff on March 3, 1942; this plan, however, was in turn replaced by a revised plan transmitted to plaintiff on March 25, 1942. These revisions, which become important in connection with defendant's counterclaim, hereinafter discussed, increased the width of the hull or beam from 10' 7½" to 11' 3".

Plaintiff's financial resources were, at the outset, totally inadequate for the performance of the contract. It had no working capital when it submitted a bid to construct two to ten boats, and was, as plaintiff's president put it, "in dire need of finances." Its "finances [were] nil." The Sterling Engine Company, which was to supply engines for the boats, communicated with plaintiff repeatedly during the period from February 21 to April 13, 1942, requesting plaintiff's order, priority rating, and advance payment of 30% which Sterling required so that work on the engines might proceed. On April 13, plaintiff issued a purchase order for eight Sterling engines at $43,569.08, but the required advance payment was not made.

During the latter part of May and June 1942, McKee and Rothmeyer, two of plaintiff's four stockholders, made advances in a total amount of approximately $11,600. On June 27, 1942, these two stockholders reorganized the corporation, at which time negotiations for a new location at Racine, Wisconsin, were authorized. On July 24, 1942, the corporation was again reorganized. Otto H. Falk, Jr., who had no prior experience in operating a boatbuilding company, offered to purchase half of plaintiff's authorized stock, and did acquire 22 shares. Falk subsequently acquired 98 additional shares, at a total invest-

ment of $6,000, and on August 14, 1942, he succeeded Polland as vice president.

In August of 1942 plaintiff's shop was moved from South Milwaukee to Racine. This resulted in the loss of several working days. At that time Falk dismissed most of Nimphius' organization,[2] and Nimphius, who was an experienced boat builder, left the corporation. E. M. Friedel, who had been employed as Nimphius' assistant about June 15, 1942, succeeded Nimphius as superintendent.

Friedel, although hard working, had little or no experience in the boatbuilding industry. After he became superintendent, he reorganized the shop, ordered and reordered materials, and became familiar with the boat plans. This necessarily consumed some time. He also began to hire men whom he considered to be experienced boat builders. One builder was hired on August 31, 1942, but it was not until about December, 1, 1942, that two others were obtained. During this period some workers hired were inefficient and had to be laid off, while others had only limited experience.

After plaintiff's shop was moved to Racine, the Supervisor of Shipbuilding at Chicago acquired jurisdiction of the contract. He immediately began to inquire as to plaintiff's progress, and as the result of his survey of the situation recommended that plaintiff's contract be cancelled. Falk made various promises and representations as to plaintiff's ability to perform, expressed his willingness to bear all losses on the contract,[3] and succeeded in bringing about a complete reorganization of plaintiff. Falk purchased all the issued stock of plaintiff and secured the resignations and releases of all its officers and stockholders, and plaintiff was thereupon permitted to continue work on the contract.

When Falk assumed control, in August of 1942, the first of the four boats was about 25% complete, exclusive of engines. The second and third boats were approximately 15% complete, and practically no work had been done on the fourth boat. At about this same time, plaintiff was allocated Sterling engines commencing in November 1942. Plaintiff's progress had apparently been less rapid than that of other contractors engaged in building similar boats, as some of those contractors were allocated engines beginning in August 1942.

On October 8, 1942, plaintiff was informed by a representative of the Hall-Scott Company that eight right-hand engines[4] could be furnished immediately if allocated by the Navy, and plaintiff requested that this substitution be authorized. The contracting officer, on November 10, 1942, authorized a modification of the contract to provide for the substitution of Government-furnished right-hand Hall-Scott "Invader" engines in place of contractor-furnished Sterling engines. Plaintiff was authorized to proceed on this basis with a contract price adjustment to be made later.

At this time the Supervisor of Shipbuilding transferred eight Hall-Scott engines to plaintiff. These engines were unsuitable and were returned to the Navy at its expense. Plaintiff was paid all costs resulting from this error. Substitute engines were received by plaintiff on November 25, 1942. There was at that time ample hull work available so that no overall delay resulted from the fact that engines were not received sooner.

---

2. Nimphius, who was in charge of actual construction of the boats until this time, had been forced to build up a new organization, as most of his key employees had obtained other jobs prior to the award of the instant contract. He was able to recruit a few experienced men, but had to operate largely with new and inexperienced help.

3. Falk anticipated that any losses which occurred on this contract would be recouped on future government contracts.

4. The contract specifications called for matched pairs of Sterling engines, consisting of a right-hand and a left-hand engine.

926

Under the contract, plaintiff was to conduct at its own expense acceptance trials prior to the delivery of each boat. In January of 1943, it was agreed, at plaintiff's request, that speed and maneuverability trials on the first boat could be conducted in San Francisco Bay, with Falk and plaintiff's engineer to accompany the boat there at plaintiff's expense. Falk took four of his employees to San Francisco with him, at considerable expense. During this period, work on the other boats proceeded, but was delayed to some extent by the absence of the four employees. The boats were delivered to defendant on March 10, April 14, April 7, and May 5, 1943, respectively.

On December 30, 1942, the contracting officer had requested plaintiff's advice as to the adjustment in contract price resulting from the change from contractor-furnished Sterling engines to Government-furnished Hall-Scott engines, stating that the reduction "should be based on the cost of Sterling engines." Commencing about May 28, 1943, plaintiff and the Department of the Navy engaged in a protracted controversy over the settlement of the contract, principally with regard to the above adjustment in contract price. The findings report the course of the controversy, with the facts bearing chiefly upon the question of the adequacy of plaintiff's request for relief. For the reason heretofore given, those facts will not be repeated.

On January 17, 1947, following the passage of the Lucas Act, plaintiff filed a claim with the Navy Department alleging a total cost of performance of $96,366.63, payments on the contract of $26,957.04 ($13,320.61 has subsequently been paid), and a loss of $69,409.59 in the performance of the contract. Plaintiff's claim was denied on December 9, 1947, by the Navy Department War Contract Relief Board on the ground that no written request for relief within the meaning of section 3 of the Act had been filed with the Navy Department by plaintiff.

■ The record before us falls far short of establishing that the losses suffered by plaintiff in the performance of its only Government contract between September 16, 1940, and August 15, 1945, or any portion of such losses, were incurred without its fault or negligence. Many factors, some of which are referred to below, were responsible for or materially contributed to plaintiff's losses.

Throughout the contract period, plaintiff's officers were inexperienced in the boat-building industry and contributed little to the performance of the contract. For a substantial part of the contract period, plaintiff's finances were totally inadequate for the performance of the contract. Among other things, payrolls could not be met and materials had to be ordered on a piecemeal basis. Though varying in degrees from time to time, plaintiff never had an efficient organization to construct the boats. For much if not all of the contract period, plaintiff's equipment was inadequate to perform the contract work; it did not have on hand machinery, equipment, and small tools which an experienced boat builder would have had as necessary to the business. There was, as Falk described it, "gross mismanagement" until August 1942. Some of the work performed was rejected as defective. The expense of testing a boat in California could have been greatly reduced, while at the same time speeding up the completion of the remaining boats. The move of plaintiff's shop to Racine resulted in the loss of time and extra costs, although plaintiff did derive certain advantages from the transfer. Plaintiff's office manager and purchasing agent, who was ultimately discharged because of financial discrepancies, was retained on the payroll until January 31, 1943, at a cost of over $1,500, despite the fact that he was incompetent and spent little time on the job.

Plaintiff originally asserted that the reasonable and necessary costs of performance of the contract amounted to $93,944.65, and that the net losses incurred were $53,167. Recovery was

sought only in the amount of $22,713.08, plaintiff conceding that it made no request for relief with respect to any other losses. In a computation set forth in its brief, the reasonable and necessary costs of performance claimed are reduced to $66,929.60, and the net losses incurred are reduced to $26,651.95.

Under the circumstances of the case, referred to briefly above and covered more fully in our findings, we are of the opinion that plaintiff may not recover on its Lucas Act claim. See Reltool Service Company v. United States, Ct.Cl., 119 F. Supp. 957, and cases there cited.

## Counterclaim

■ Plans for the lines and offsets of the boats were twice revised. In the course of the lengthy controversy over the settlement of the contract, the head of the department, in response to a letter from Falk, plaintiff's vice president, indicated that "the contract price should be increased only to the extent necessary to cover the change in lines, if substantiated."

Subsequently, on May 17, 1945, plaintiff submitted to defendant a detailed breakdown of costs incurred because of the changes in lines of the boats. Plaintiff indicated that between February 8 and March 26, 1942, under plans ultimately superseded, it had expended some $2,912.37, including $1,245.20 for labor, $621.20 for materials, and $1,045.97 for overhead. The contracting officer, in his settlement proposal of June 14, 1945, allowed plaintiff the entire amount of the claimed increased costs resulting from the changes in plans without investigating the facts, and plaintiff has been paid this amount as a part of the total contract price.

Plaintiff did not expend the amount claimed by it and allowed by the contracting officer, and this fact was clearly apparent from plaintiff's records at the time plaintiff's claim of May 17, 1945, was prepared. Plaintiff did not lay any lines under the plans ultimately superseded.

In its brief, plaintiff asserted that the decision of the contracting officer, not appealed from, on a question of fact under the "Disputes" article of the contract is final and binding upon both plaintiff and defendant, in the absence of fraud on the part of the contracting officer. United States v. Wunderlich, 342 U.S. 98, 72 S.Ct. 154, 96 L.Ed. 113. Defendant contended that in the instant case plaintiff's claim, made at a time when it was clearly apparent from plaintiff's books and records that the amount claimed by it had not been expended, was a misrepresentation constituting a breach of contract, for which defendant was entitled to recover damages measured by the amount of the erroneous overpayment.

We are of the opinion that under the Wunderlich doctrine or under the Act, approved May 11, 1954, 68 Stat. 81, 41 U.S.C.A. §§ 321, 322, plaintiff may not take advantage of the rule attaching finality to administrative decisions to profit from making a claim for money it did not spend and which its records clearly showed was unjustified.

Plaintiff's petition is dismissed. Judgment will be entered in favor of defendant on its counterclaim in the amount of $2,912.37, plus interest at the rate of 4% per annum from the date of demand, September 4, 1952. See McClure v. United States, 125 Ct.Cl. 16, 110 F.Supp. 603.

It is so ordered.

JONES, Chief Judge, and MADDEN, and WHITAKER, Judges, concur.

LARAMORE, Judge, took no part in the consideration or decision of this case.