### HOLT–FAIRCHILD CO. v. UNITED STATES.

#### No. 49153.

United States Court of Claims.

May 5, 1953.

Richard C. Evarts, Boston, Mass., Lyne, Woodworth & Evarts, Boston, Mass., on the brief, for plaintiff.

Gordon F. Harrison, Washington, D. C., with whom was Holmes Baldridge, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

HOWELL, Judge.

This suit is brought under the War Contract Hardship Claims Act, known as the Lucas Act, 60 Stat. 902, as amended by 62 Stat. 869, 992, 41 U.S.C.A. § 106 note, to recover the net loss alleged to have been sustained by plaintiff without fault or negligence on its part in the performance of Government contracts between September 16, 1940, and August 14, 1945. By stipulation of the parties, the net loss incurred by plaintiff on all of its Government contracts between September 16, 1940, and August 14, 1945, was $43,857.69.

The defendant contends that paragraphs 204 and 307 of Executive Order 9786, 11 F.R. 11553, U.S.Code Cong.Serv.1946, p. 1848, bar plaintiff's recovery. The defendant also contends that, in any event, plaintiff's recovery is limited to not more than $17,885.76 on the ground that, except as to this amount, plaintiff failed to file a proper "written request for relief" within the meaning of Section 3 of the Lucas Act.

The facts are not in dispute. Plaintiff entered into several contracts with the Federal Public Housing Authority, National Housing Agency, on May 20, 1942, for the fabrication and field erection of about 400 demountable housing units in Connecticut. By letter of September 19, 1942, the plaintiff was notified by the Housing Authority to proceed to fabricate and complete field erection of all housing units under the two contracts pertaining to the Manchester, Connecticut housing project. Later, by let-

ter of February 18, 1943, the Housing Authority notified the plaintiff to proceed similarly under the contracts relating to the East Hartford, Connecticut project.

Due to the delay in receiving the orders to begin performance under the field erection contracts, plaintiff incurred additional expenses in the form of higher labor and materials costs due to the manpower shortage, materials scarcities, and the circumstance that part of the work had to be done in winter weather. In addition, plaintiff incurred higher labor costs in the form of overtime wages because of the mandatory 48-hour week required by Executive Order 9301, 8 F.R. 1825, 29 U.S.C.A. § 207 note, which was issued on February 9, 1943. Plaintiff completed work on the Manchester project in March 1943 and on the East Hartford project in August 1943, and the losses incurred by plaintiff in performing its contracts were not due to fault or negligence on its part.

Subsequent to the passage of the Lucas Act, plaintiff's claim for losses was filed with the Housing Authority within the statutory period, and the claim was denied. Thereupon, plaintiff filed a timely petition in this court.

At the outset, we should state that the contentions of the defendant which relate to paragraphs 204 and 307 of Executive Order 9786, 11 F.R. 11553, have been fully considered and rejected in some of our previous decisions, e. g., Howard Industries v. United States, 83 F.Supp. 337, 113 Ct.Cl. 231; American Construction Co. v. United States, 107 F.Supp. 858, 123 Ct.Cl. 408, certiorari denied 345 U.S. 922, 73 S.Ct. 780 [1] and upon reconsideration of these arguments, we find no reason for departing from our previous holdings.

With respect to defendant's contention that plaintiff failed to file a proper written request for relief with the Housing Authority within the meaning of the Lucas Act, plaintiff relies on 10 different letters sent by it to the Housing Authority which it claims were proper written requests for relief. Two of these letters relate to a loss of $17,885.76 which represents overtime wages plaintiff had to pay because of the mandatory 48-hour week required by Executive Order 9301, 8 F.R. 1825, and as to this, defendant concedes that a valid written request was filed. As to the eight other letters relied upon, plaintiff must show that one of them constituted a proper "written request for relief" under Section 3 of the Lucas Act which provides in part that:

"Claims for losses * * * shall be limited to losses with respect to which a written request for relief was filed with such department or agency on or before August 14, 1945, * * *."

■ Although no particular form of request is required, the written request "must be sufficient to apprise the agency that it was being asked to grant extra-legal relief under the First War Powers Act [50 U.S. C.A.Appendix, § 601 et seq.] for losses sustained in the performance of war contracts." Fogarty v. United States, 340 U.S. 8, 13, 71 S.Ct. 5, 8, 95 L.Ed. 10.

Insofar as this record reveals, the net losses, over and above the amount of $17,885.76, suffered by the plaintiff as a result of performing the field erection contracts, arose by virtue of the excess costs resulting from the Housing Authority's delay in giving the notices to proceed. Because of the delay, plaintiff had to hire workers at wage rates which were higher than those prevailing when the contract was signed, and the work was required to be done in winter weather under which labor efficiency was much lower and labor costs were thus much higher. In addition, plaintiff had to buy lumber at higher prices than those prevailing at the time the contract was signed, and it was required to incur additional costs in the form of trucking taxes and increased surety bond premiums.

Plaintiff's contracts, however, did not provide for any equitable adjustment in price because of increased costs resulting from such delays. The contracts provided only for the granting of extensions of time

1. See also Cowhig v. National Military Establishment, D.C.1953, 109 F.Supp. 519, 521; Stephens-Brown, Inc. v. United States, D.C.1949, 81 F.Supp. 969, 971; McGann Mfg. Co. v. United States, D.C. 1951, 98 F.Supp. 225, 229.

where delays were caused through no fault of the plaintiff (finding 18). The letter of September 26, 1944 from the Commissioner of the Housing Authority to the plaintiff shows, moreover, pp. 6–12, that the Housing Authority was on notice that plaintiff did not have a valid claim under the terms of its contracts for the losses caused by the delays (finding 20). In addition, these delays were not the result of unreasonable or arbitrary action on the part of the Housing Authority (finding 19) so as to constitute a breach of contract. Fuller v. United States, 69 F.Supp. 409, 108 Ct.Cl. 70; Parish v. United States, 98 F.Supp. 347, 120 Ct.Cl. 100, 124–126.

█ It therefore appears that plaintiff had no legal remedy either under the terms of its contracts or for breach of contract whereby it could secure monetary relief for increased costs caused by such delays. Cf. Evans v. United States, 8 Cir., 200 F.2d 201, 205, 207–208. The only remedy available would have been an amendment to its contracts without consideration under Section 201 of the First War Powers Act.

The eight other letters referred to above which are relied upon by the plaintiff are the letters of August 19, August 21, September 14, September 26, October 21, and December 6, 1943, July 3, 1944, and December 29, 1942.[2] The nature of these letters and quotations therefrom are set forth in our findings, and it is unnecessary to restate them here in detail.

The letters of August 19 and 21, 1943, however, give detailed descriptions of the extra costs incurred by plaintiff on the Manchester and East Hartford projects, respectively, which were due, among other things, to the delays in beginning the work. The requests for reimbursement in these two letters and in the other six letters, in-

sofar as they relate to the losses caused by the delays, are requests concerning which, as shown above, the plaintiff had no legal remedy either under the terms of the contracts or for breach of contract.

In its brief, defendant points out that some of plaintiff's requests for relief included claims for reimbursement for costs which had been considered by plaintiff and the contracting agency as claims cognizable under the contracts. It is true that certain admittedly contract claims were included in these letters and plaintiff received change orders granting monetary relief as a matter of right for portions of the amounts claimed. Although plaintiff continued, after acceptance of the change orders, to ask for the balance not granted by the orders, the record fails to indicate that those change orders did not reimburse plaintiff for the actual excess costs attributable to those items. We have accordingly concluded that the net loss of $43,857.69 stipulated by the parties as the net loss on the contracts is all attributable to excess costs not reimbursable under plaintiff's contracts and therefore recoverable under the Lucas Act (finding 16).[3]

█ Accordingly, viewing these letters as a whole and the nature of the claims presented therein with respect to the delays, we conclude that they constituted requests for extra-legal relief, and that they were sufficient to apprise the Housing Authority that it was being asked to grant extra-legal relief for the losses sustained by plaintiff in its war contracts. Fogarty v. United States, 340 U.S. 8, 13, 71 S.Ct. 5, 95 L.Ed. 10.

It is our conclusion, therefore, that plaintiff is equitably entitled to the amount of $43,857.69 in settlement of its claim. An order will be entered, pursuant to Section

2. These letters, respectively, are exhibits 81, 82, 83, 84, 91, 96, 109, and letter No. 4, attached to exhibit 122. Plaintiff, in its brief, abandoned its reliance on exhibit 38, the letter of December 24, 1942.

3. The above discussion points up the distinction between actual net loss of performance of contracts, and allowable net loss under the Lucas Act. If the rec-

ord had shown that certain excess costs were actually attributable to contract items and thus could have been recovered under the terms of the contract, the amount of such costs would have to be deducted from the actual net loss to determine the amount of such net loss allowable under the Lucas Act. Evans v. United States, supra; Fogarty v. United States, supra.

6 of the Lucas Act, directing the Federal Public. Housing Authority, National. Housing Agency, or its successor agency to settle such claim in accordance with the findings of this court, in the amount of $43,-857.69.

JONES, Chief Judge, and LITTLETON, Judge, concur.

WHITAKER, Judge (concurring).

I feel impelled to write this concurring opinion in order to point out my view that the right to relief under the Lucas Act is determined by the nature of the claim made; that is, whether a legal right is asserted, or extra-legal relief is requested, and not by whether or not a legal right exists. It may be clear that a contractor had no legal right to recover excess costs; but if he asserts a legal right as a basis of his claim to recover them, he is not entitled to recover under the Lucas Act. Fogarty v. United States, 340 U.S. 8; 71 S.Ct. 5, 95 L.Ed. 10.

Where it is uncertain whether or not a legal right was asserted or extra-legal relief was requested, it is proper to consider whether or not the contractor had any possible legal right in determining whether or not he was asserting one; [4] but, still, the prime question is the nature of the claim asserted, and not whether or not the right existed.

I concur in the decision because I think plaintiff's letters presenting its claims were requests for extra-legal relief. For instance: in its letter of August 19, 1943, quoted in part in finding 17 (plaintiff's exhibit 81), plaintiff said:

"We kept plugging in spite of all obstacles, *and simply appeal to your sense of fair play to reimburse us for the extra expense,* not contemplated by the Government or by us when this contract was negotiated." [Italics ours.]

Also, in its letter of September 26, 1943, also quoted in part in this finding (plaintiff's exhibit 84) it said:

"We trust that you will give this your earnest consideration, and *that in the spirit of fair play you will see the justice of our claims.* * * *" [Italics ours.]

Again, in its letter of April 14, 1944, quoted in part in this finding (plaintiff's exhibit 105) it said:

"We trust that this covers your requirements, and *that, you will recognize the moral issue involved* * * *." [Italics ours.]

In none of these letters do we find the assertion of any legal right and it does seem to me that plaintiff was requesting relief only "in the spirit of fair play" and in the hope that the defendant would "recognize the moral issue involved."

Because I think plaintiff's claims were for extra-legal relief, and were not the assertion of a claimed legal right, I concur in the decision.

I am authorized to say that Judge Madden concurs in this opinion.

### Findings of Fact

The court makes findings of fact, based upon the evidence, the report of Commissioner William E. Day, and the briefs and argument of counsel, as follows:

1. The plaintiff, a corporation. organized and existing under the laws of the Commonwealth of Massachusetts, pursuant to several contracts furnished work, supplies and services between September 16, 1940, and August 14, 1945, to the defendant acting by and through the Navy Department and the Federal Public Housing Authority (sometimes hereinafter referred to as FPHA). Both agencies mentioned above had been authorized between such dates to enter into contracts and amendments or modifications of contracts under Section 201 of the First War Powers Act, 50 U.S. C.A.Appendix, § 611.

The plaintiff's action, founded upon the Lucas Act, 60 Stat. 902, seeks to recover the net loss it sustained under such contracts.

2. The parties have stipulated that the net loss incurred by the plaintiff between September 16, 1940, and August 14, 1945,

4. Depew Paving Co., Inc. v. United States, 104 F.Supp. 94, 122 Ct.Cl. 151; certiorari denied, 344 U.S. 854, 73 S.Ct. 90.

on all contracts held by plaintiff was $43,-857.69. A profit was shown on the Navy contract, and such profit was considered in arriving at this figure.

3. The loss described in the foregoing finding was incurred without fault or negligence on the part of the plaintiff in its performance of contract work but was due to causes hereinafter described.

4. On February 21, 1942, the Federal Works Agency (a predecessor of the Federal Public Housing Authority) issued a letter of intent to the plaintiff by which it ordered 400 prefabricated houses at a fixed price, and by the acceptance of the letter of intent by the plaintiff, secured an option for the transportation and erection of such houses by the plaintiff at a fixed price. The plaintiff accepted the letter of intent on or about February 21.

5. Thereafter on May 20, 1942, six contracts were entered into between the plaintiff and the defendant, acting through the Federal Public Housing Authority, as follows:

"WAh (D–Conn–6121)–9—which provided for the prefabrication of 100 demountable housing units at a total price of $244,180.44, F. O. B. plaintiff's factory.

"WAh (D–Conn–6121)–10—which provided for the transportation, construction and erection of the above 100 demountable housing units at East Hartford, Conn., at a total price of $45,737.86.

"WAh (D–Conn–6122)–9—which provided for the prefabrication of 125 demountable housing units at a total price of $305,489.47, F. O. B. plaintiff's factory.

"WAh (D–Conn–6122)–10—which provided for the transportation, construction and erection of the above 125 demountable housing units at Portland, Conn., at a total price of $57,207.-88.

"WAh (D–Conn–6126)–9—which provided for the prefabrication of 175 demountable housing units at a total price of $427,051.85, F. O. B. plaintiff's factory.

"WAh (D–Conn–6126)–10—which provided for the transportation, construction and erection of the above 175 demountable housing units at Manchester, Conn., at a total price of $80,-005.70."

6. The delivery requirements of the contracts described in the preceding finding were as follows:

"*No. 6121–9, East Hartford, prefabrication:*

"Deliveries shall be made as specified in the Schedule of Deliveries which will be furnished by the Contracting Officers, but in any event all units shall be delivered within 80 consecutive calendar days from and after the date of formal notice to commence deliveries.

"*No. 6121–10, East Hartford, erection:*

"The work shall be commenced as soon as but not later than the date set forth in the Notice to Proceed with such work and shall be completed in accordance with a schedule of completion to be furnished by the Contracting Officer, but in any event within 90 consecutive calendar days after the date for the commencement of work.

"*No. 6122–9, Portland, prefabrication:*

"Deliveries shall be made as follows: as specified in the Schedule of Deliveries which will be furnished by the Contracting Officers, but in any event all units shall be delivered within 90 consecutive calendar days from and after the date of formal notice to commence deliveries.

"*No. 6122–10, Portland, erection:*

"The work shall be commenced as soon as but not later than the date set forth in the Notice to Proceed with such work, and shall be completed in accordance with a schedule of completion to be furnished by the contracting officer, but in any event within 100 consecutive calendar days after the date for the commencement of work.

"*No. 6126–9, Manchester, prefabrication:*

"Deliveries shall be made as follows: as specified in the Schedule of Deliveries which will be furnished by the Contracting Officer but in any event all units shall be delivered within 100 consecutive calendar days from and after the date of formal notice to commence deliveries.

"*No. 6126–10, Manchester, erection:*

"The work shall be commenced as soon as but not later than the date set forth in the Notice to Proceed with such work, and shall be completed in accordance with a schedule of completion to be furnished by the contracting officer, but in any event within 120 consecutive calendar days after the date for the commencement of work."

7. Contracts numbered WAh (D–Conn–6122)–9 and WAh (D–Conn–6122)–10 were abandoned before the operations were begun, and the demountable housing units contemplated therein were constructed as part of the East Hartford, Conn., project. After certain changes, adjusted by change orders, combinations resulted in the prefabrication and erection of 221 demountable housing units under contracts WAh (D–Conn–6121)–9 and WAh (D–Conn–6121)–10.

8. The plaintiff's original bid, which was incorporated in the letter of intent referred to in finding 4, was based upon the prefabrication at the factory proceeding in unison with the transportation of the units from the factory to the field for immediate erection since there was practically no storage space for completed units at the factory, and the movement of such completed units was costly and required coordination between the factory work and field erection to obviate excess handling.

9. As early as March 6, 1942, the plaintiff, by letter, urged the contracting officer who signed the letter of intent to allow the plaintiff to begin construction by April 1, because the plaintiff's bid was based upon labor and material conditions existing at that time. The defendant, for reasons not shown by the record, delayed the issuance of any Notice to Proceed until August 20, 1942. On that day the Acting Regional Director of FPHA wrote to the plaintiff and authorized it to proceed with the fabrication of as many of the dwelling units under contract WAh (D–Conn–6121)–9, East Hartford, as the plaintiff could store under cover at the factory, with the understanding that such storage facilities were available for thirty or more units. This Notice to Proceed was by its terms effective August 24, 1942, and was specifically not applicable to contract (Conn–6121)–10 for erection of the units. It was stated that such Notice to Proceed as to the erection contract would be issued later.

10. On August 22, 1942, the plaintiff wrote to Mr. John D. Blandford, Jr., Director, National Housing Administration, saying in part:

"While we appreciate the difficulties that you have had to unsnarl when you inherited the Fabricated House Program from Mr. Newman, we are forced into the position wherein we must impose upon your over-burdened time for relief from the existing conditions.

\*　　\*　　\*　　\*　　\*　　\*

"It is, however, the end of August, and our organization is seriously affected by our inability to receive proceed orders. (We have received a limited, 30-house proceed order.) During the past six months, we have had our 80,000 square foot factory idle, and have been unable to hold our entire organization of men together. The nucleus we have held has cost us thousands of dollars, while we have been able to produce nothing because of the week to week imminence of the housing contracts.

\*　　\*　　\*　　\*　　\*　　\*

"We therefore sincerely hope that immediate action can be taken, which will allow the three site contractors and ourselves to proceed at once.
\*　\*　\*"

11. The Acting Regional Director of the FPHA by letter of September 19, 1942, issued another Proceed Order by the terms

of which the houses which had been fabricated for project Conn–6121 were diverted to project Conn–6126, and the plaintiff was notified to fabricate all units under project Conn–6126 as well as to complete field erection at Manchester under contract WAh (D–Conn–6126)–10. The effective date of this Proceed Order was September 21 for the fabrication and September 24 for the erection. This letter was acknowledged by the plaintiff by letter of September 20 which states in part as follows:

"* * * As of this date we find the site is not yet ready to receive any of our prefabricated units and wish to be recorded as to this fact."

12. The field erection work was started at the Manchester site on October 7, 1942, as the site was not ready for operations before that time.

13. By letter of November 27, 1942, the plaintiff complained of its inability to obtain sufficient common labor for its operations, both in the prefabrication at the factory and in its field erection activities at Manchester. Plaintiff's complaint referred as well to the poor quality of laborers which it had secured and the large turnover of workers.

14. On November 18, 1942, the plaintiff wrote the following letter to the Housing Authority at Boston:

"As per your request we submit the following regarding the purchase of framing lumber for the above projects.

"Upon receipt of Letter of Intent from the Government dated February 21, 1942, we proceeded to obtain prices and dates of delivery for this lumber and from our understanding that there was to be great haste in the construction of these projects we purchased approximately 1,300,000 feet of Western Fir from the Weyerhaeuser Sales Company on April 4, 1942, for delivery from their East Coast stock at a price approximately $10,000 more than the same material could have been purchased for had the delivery been made from the West Coast.

"The difference of approximately $10.00 a thousand is accounted for by the charge for unloading, storage, loading and freight from East Coast points to our plant in Chicopee.

"The order for the balance of the lumber requirements was placed with Lawrence R. McCoy and Company of Worcester on April 10, 1942, this material to come from the West Coast and deliveries to be made after we had consumed a portion of the stock which we had already received from the Weyerhaeuser East Coast material.

"For reasons beyond our control the Proceed Order covering Manchester 6126 was not issued until September 21 and to date we have not received the Proceed Order for East Hartford, Conn–6121.

"We started the manufacture of the Manchester Project immediately upon receipt of the Proceed Order, and we have used a considerable proportion of the material purchased from Weyerhaeuser.

"Unless we are to be seriously delayed in the manufacture of the balance of the Manchester Project as well as the East Hartford Project when authorized to proceed, it is necessary that we start shipment of the balance of our orders.

"During the time we were delayed in the nonreceipt of Proceed Orders the Government issued an order prohibiting the delivery of any framing lumber except by special allotment.

"As we were in dire need of further shipments of lumber, through the Weyerhaeuser Sales Company, we requested from the War Production Board an allotment of approximately 805,000 feet BM of framing lumber in order to complete our contracts and we are informed that the War Production Board has granted permission for us to purchase this lumber from stock held on the East Coast.

"If the purchase is made from stock held on the East Coast the cost of this material will exceed the cost of the same material if delivered from the West Coast by approximately $8,200.

"Inasmuch as we have already assumed an additional expense of $10,000 in order to hasten the manufacture of these houses, and since the delay in issuing the Proceed Order has prevented our purchase of the lumber from the West Coast, it does not appear to us to be fair or reasonable to expect us to assume this additional expense at this time, and we, therefore, request that you either obtain permission to ship this lumber immediately from the West Coast at no additional expense to the Government or ourselves, or agree to reimburse us for the actual cost, without profit, for the amount incurred by our being obliged to purchase from East Coast stock."

The record does not disclose any reply to the above-quoted letter.

15. The Housing Authority issued no Proceed Order on (Conn–6121)–9, (Conn–6121)–10, East Hartford, or on (Conn–6122)–9, (Conn–6122)–10, Portland, Connecticut, except the limited, approximately 30-unit Proceed Order discussed in finding 9, which was converted into a Proceed Order for the Manchester project as shown in finding 11, until February 18, 1943, at which time it addressed the following letter to plaintiff:

"Reference is made to the contracts between your firm and the United States of America for 100 demountable dwelling units for Pitkin Homes (Conn–6121), East Hartford, particularly contracts WAh (D–Conn–6121)–9 for prefabrication, and WAh (D–Conn–6121)–10 for transportation, construction, and erection. Reference is also made to similar contracts for 125 demountable dwelling units which were contemplated for Project Conn–6122, Portland, particularly contracts WAh (D–Conn–6122)–9, and WAh (D–Conn–6122)–10.

"You are advised that War Housing Project Conn–6122, Portland, has been abandoned. The 125 demountable housing units contemplated for this project shall be constructed as a part of Pitkin Homes (Conn–6121), East Hartford, except that it has become necessary to eliminate units numbered 18B and 19C. This will reduce the number of dwelling units to 221, making a combined project of three single and 109 twin houses. The contract price under the contract WAh (D–Conn–6121)–9 will be decreased by change order in an amount of $2,365.37 for the omission of Building 18B, and $2,741.20 for the omission of Building 19C. Under the contract WAh (D–Conn–6121)–10, the contract price will be reduced by the amount of $449.47, and $449.13 respectively for the omission of these buildings.

"Effective February 19, you are authorized to proceed with the work contemplated under the above-mentioned contracts, subject to the changes in drawings and specifications hereinafter described, with the understanding that the contract price will be adjusted by change order as set forth under each change: * * *"

On February 20, 1943, the plaintiff acknowledged receipt of the above-quoted Notice to Proceed, noting that the time of completion was to be based on a starting date of February 19, 1943, as to contracts Conn–6121 and Conn–6122.

16. During the course of its operations, the plaintiff, in writing, made many complaints, requests for time extensions and claims under the contracts involved. These complaints, requests and claims resulted in the following affirmative action under the contracts:

"Change Order No. 7, dated June 17, 1943, applying to four contracts, extending the contract time twelve calendar days because certain units were changed to twin houses rather than single houses, necessitating changes in the jigs and assembly lines.

"Change Order No. 4, dated March 21, 1944, to contract WAh (D–Conn–6126)–9 extending the contract time 108 calendar days to cover delays in procuring necessary manpower.

"Change Order No. 37, dated March 23, 1944, applying to four contracts,

extending the contract time by reason of twinning of houses, manpower shortage, and protective features on flues, as follows:

(1) WAh (D–Conn–6121)–9....36 days
(2) WAh (D–Conn–6122)–9....88 days
(3) WAh (D–Conn–6121)–10..118 days
(4) WAh (D–Conn–6122)–10..205 days

"Change Order No. 30, dated June 9, 1944, to contract WAh (D–Conn–6126)–10 extending the contract time 192 calendar days because of delays in delivery of prefabricated house sections and additional work authorized by change orders.

"Change Order No. 2, dated June 2, 1943, to contract WAh (D–Conn–6126)–10 increasing the contract price $1,000 to cover rental of road-scraping equipment and operator.

"Change Order No. 3 dated June 2, 1943, to contract WAh (D–Conn–6126)–10 increasing the contract price $300 to cover extended rental of the equipment then being used to maintain the project roads in usable condition.

"Change Order No. 16, dated July 26, 1943, to contract WAh (D–Conn–6126)–10 increasing the contract price $1,792.43 to cover the cost of larger concrete piers necessitated by grade conditions on the project site.

"Change Order No. 31, dated February 16, 1945, to contract WAh (D–Conn–6126)–10 increasing the contract price $11,786.35 to cover additional lengths of joists necessitated by some very hilly lots at the contract site. There is nothing in the record to indicate that plaintiff did not recover by virtue of the last four change orders referred to above, its actual excess costs on the items involved therein."

17. The written requests for relief upon which the plaintiff relies are found in its exhibits which are in evidence and numbered 81, 82, 83, 84, 91, 96, 105, 109, 116, and 122. These will be described in order.

### Plaintiff's Exhibit No. 81

This is a detailed claim dated August 19, 1943, on the Manchester project covering 46 items on which change orders were requested. Items 1 through 7 related to extra cost involved by site conditions. It was claimed that the contract was based upon an assumed level lot and the changes were made necessary due to the variance from a level lot. Items 8 and 9 related to failure to provide access roads. Items 10 through 21 all related to the late receipt by the plaintiff of an order to proceed with the work. The remaining items related to changes in plans or specifications. The letter of claim concluded with the following:

"This review has been long and tedious, but necessary. Frankly, a major portion of extra costs are directly chargeable to the delay between the signing of the contract and the proceed order. In all such cases we have simply asked to be reimbursed in the amount of the extra cost we have had to stand. In no such case have we asked for any profit. Throughout the project construction, we have adhered to our endeavor to produce for you the best demountable houses in the New England program. We believe you will agree that we have. We therefore did not have the margin between cost and contract price which would allow us to absorb the large sums involved, so find it necessary to insist upon reimbursement, since the expense and the delay was directly the fault of the breakdown of the Newman organization which you had to take over.

"We took an awful beating by the delay, as enumerated above, and by the winter weather encountered, but not figured in the negotiations. We kept plugging in spite of all obstacles, and simply appeal to your sense of fair play to reimburse us for the extra expense, not contemplated by the Government or by us when this contract was negotiated."

### Plaintiff's Exhibit No. 82

This is a detailed claim dated August 21, 1943, on the East Hartford project covering 41 items on which change orders were requested, following generally the form of exhibit No. 81 described above.

### Plaintiff's Exhibit No. 83

This is a letter dated September 14, 1943, which thanked the Housing Authority for expediting the processing of certain change orders as had been received by that time but calling attention to the question of reimbursement sought for losses incurred because of the long and unusual delay between the signing of the contract and the issuance of Proceed Orders. After a discussion of the problems involved by such delays, the letter concluded as follows:

"Had we aspired to becoming rich on these contracts by designing and furnishing the least possible quality of housing, we could have swallowed a great part of this loss. We, however, from the very beginning have had the policy that this program offered an ideal opportunity for the establishment of Prefabricated House Industry, with the result that we have tried to give you the best houses in the entire program; houses that both you and we could be proud of even though our profit margin was small. We therefore had no wide margin to fall back on, and are only asking for reimbursement for excess costs, caused by no fault of ours, in order that we may come out with a whole skin."

### Plaintiff's Exhibit No. 84

This letter from plaintiff dated September 26, 1943, complained of the failure to receive change orders on the items relating to the delay between the signing of the contracts and the issuance of the Proceed Order. It concluded in the following terms:

"We trust that you will give this your earnest consideration, and that in the spirit of fair play you will see the justice of our claims. Since it has on numerous occasions been admitted by F. P. H. A. officials that the houses we have given are far better than those on any other New England Prefabricated Project, you will realize that we did not aspire to a margin of profit which would allow us to absorb these tremendous losses.

"Having been with the Housing Division, I of course realize the limitations placed upon approval of claims such as these. Therefore, if you think best, and with your approval, I will contact Washington direct, in an effort to get the matter adjusted."

### Plaintiff's Exhibit No. 91

This letter from the plaintiff dated October 21, 1943, is quoted in full below:

"We appreciate that you inherited a badly entangled Prefabricated Housing program from the Rufe Newman group. Having negotiated and signed three contracts with said group, we were an innocent party to the delay, and suffered badly thereby. We therefore appeal to you, under Article 12 of our contracts, for equitable relief.

"These contracts were signed on February 21, 1942, and were negotiated upon the use of our organization which had recently completed a large Navy Housing project at Newport, R. I., with work to start April 1st. The contracts were renegotiated with your organization and new contracts were signed on May 20, with the reasonable presumption that proceed orders would be issued in the usual ten to thirty days. No irreparable damage thus far resulted.

"Proceed orders, however, were not issued until late September in the case of the Manchester-Conn. 6126 Contract, thus throwing us into costly winter construction, and not until after a lapse of seven months from the original date of the contract.

"The proceed order on the other two contracts, Conn. 6121 and 6122, at East Hartford, were not issued until February 19, 1943, in the midst of an exceptionally severe winter, and not until after a lapse of one year from the date of the original contracts.

"As an experienced administrator of construction work, I need not remind you that with a War on the Manpower and Material situation became daily more critical and costly during the

many months of delay, while field construction in severe winter weather is of course far more costly than would have been estimated for summer work, as were these contracts.

"You can therefore appreciate that we were badly damaged. Had we aspired to becoming rich on these contracts by designing and constructing the least possible quality of housing, we could have swallowed a great part of this loss. We, however, from the beginning have had the policy that the program offered an ideal opportunity for the establishment of the Prefabricated House Industry, with the result that we tried to and did give you the best houses in the entire program.

"We had no wide margin to fall back on, and have asked for reimbursement of substantiated excess costs caused by this delay, for the sole purpose of saving this company from destruction. We lost our entire organization during the delay, since we nor anyone else could have afforded to carry them idly these many months. We hope the company can be saved.

"I am enclosing a complete file of the situation, and since I am leaving Washington on Wednesday morning next, I would sincerely appreciate it if you would delegate the matter to one of your assistants with whom I could confer before that date. I do have an unbreakable engagement for Tuesday morning. Any other time at your convenience, will be suitable to me."

Plaintiff's Exhibit No. 96

This is a further letter from the plaintiff dated December 6, 1943, pleading with the Commissioner of the Housing Authority for a review of the plaintiff's claims and requesting an equitable adjustment for the damage resulting from seven months' delay.

Plaintiff's Exhibit No. 105

This is a letter dated April 14, 1944, in substantiation of the plaintiff's claim for premium time for working its employees 48 hours per week. It concludes with the following:

"We trust that this covers your requirements, and that you will recognize the moral issue involved, since we sincerely and capably conducted our fulfillment of our contractual obligations in spite of unprecedented delays and working conditions."

Plaintiff's Exhibit No. 109

This is a letter dated July 3, 1944, in which the contractor presents a summary of its claims previously submitted and not favorably considered by the Housing Authority. It appeals to the Government for an equitable reimbursement for the great damage it suffered which it says was due to causes solely within the control of the Government.

Plaintiff's Exhibit No. 116

This is a letter dated July 11, 1945, from counsel for the plaintiff to the Housing Authority. It discusses only two items of claim, premium time for overtime work due to the imposition of the 48-hour work week, and one change order concerning insulation. It deals primarily, however, with the question of premium time for overtime, and it is the only letter of claim in which relief under the First War Powers Act is discussed.

Plaintiff's Exhibit No. 122

This is the claim dated February 3, 1947, filed on behalf of the plaintiff by counsel addressed to the Commissioner of the Housing Authority.

18. The provisions in contracts WAh (D–Conn–6121)–10, WAh (D–Conn–6122)–10, and WAh (D–Conn–6126)–10, relating to delays are as follows:

Article 9. *Delays—Damages.*—If the contractor refuses or fails to prosecute the work, or any separable part thereof, with such diligence as will insure its completion within the time specified in article 1, or any extension thereof, or fails to complete said work within such time, the Government may, by written notice to the contractor, terminate his right to proceed with the work or such part of the work as to which there has been delay. * * * *Provided,* That the right of the con-

942

tractor to proceed shall not be terminated or the contractor charged with liquidated damages because of any delays in the completion of the work due to unforeseeable causes beyond the control and without the fault or negligence of the contractor, including, but not restricted to, acts of God, or of the public enemy, acts of the Government, acts of another contractor in the performance of a contract with the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather or delays of subcontractors due to such causes, if the contractor shall within 10 days from the beginning of any such delay (unless the contracting officer, with the approval of the head of the department or his duly authorized representative, shall grant a further period of time prior to the date of final settlement of the contract) notify the contracting officer in writing of the causes of delay, who shall ascertain the facts and the extent of the delay and extend the time for completing the work when in his judgment the findings of fact justify such an extension, and his findings of fact thereon shall be final and conclusive on the parties hereto, subject only to appeal, within 30 days, by the contractor to the head of the department concerned or his duly authorized representative, whose decision on such appeal as to the facts of delay and the extension of time for completing the work shall be final and conclusive on the parties hereto.

\* \* \* \* \* \*

"Section 44. Amendments and additions to the form of Contract.

"Article 9 shall be amended as follows:

\* \* \* \* \* \*

"The Contractor shall not be charged with liquidated damages when the delay is occasioned by the inability of the contractor or any of his subcontractors or materialmen to obtain the materials or labor necessary for the performance of the contract work, provided the contractor, or his subcontractors or ma-

terialmen, has used due diligence in attempting to procure the necessary materials or labor, and provided further that the contractor shall, within ten days from the beginning of any such delay or such further time as may be approved by the Head of the Department notify the Contracting Officer in writing of the cause of the delay."

Change orders granting extensions of time pursuant to the above provisions are listed in finding 16.

19. The record does not show that the Housing Authority's delays in issuing the notices to proceed were arbitrary or unreasonable. The letter of September 26, 1944 from the Commissioner of the Housing Authority to the plaintiff indicates that the delays resulted from, among other things, the difficulties of the site contractor in obtaining a priority for materials from the War Production Board.

20. The Regional Director of the FPHA denied the plaintiff's claims, whereupon the plaintiff appealed in accordance with pertinent contract provisions to the Commissioner of the FPHA. By letter to the plaintiff dated September 26, 1944, the Commissioner denied the plaintiff's claims. In denying plaintiff's requests for reimbursement of excess costs due to the delays in receiving the orders to proceed, the Commissioner noted that plaintiff's contracts contained no provisions which permitted the making of such payments to the plaintiff.

21. Among the claims denied by the Commissioner on September 26, 1944, was one in the amount of $17,885.76, of which $12,933.00 was applicable to projects Nos. Conn–6121 and Conn–6122, and $4,952.76 was applicable to project No. Conn–6126, which represented increased costs to the contractor necessitated by the issuance of Executive Order 9301, dated February 9, 1943, which made a 48-hour week mandatory on Government contracts of the type involved here. The Commissioner determined that the issuance of Executive Order 9301 was a sovereign act of the Government for which the Government could not be held legally liable in its contractual capacity. The Commissioner recognized

that it might be desirable to extend relief under the First War Powers Act and Executive Orders 9001 and 9116, 50 U.S.C.A. Appendix, § 611 note but concluded that such extraordinary relief could not be extended on the basis of the information plaintiff had submitted.

22. The plaintiff continued to press its claim for extra costs predicated on the 48-hour week. On March 27, 1945, the Regional Director of the FPHA administratively determined that the plaintiff's case was not a proper one for relief under the First War Powers Act. Plaintiff appealed this determination to the FPHA Commissioner. That official, on July 19, 1945, determined that plaintiff's claim was not eligible for relief under the First War Powers Act because it could not be found that the relief sought would facilitate the prosecution of the war effort.

23. The above claim and all of the many other previous claims of the plaintiff were the subject of a comprehensive appeal to the Comptroller General of the United States, in the total sum of $195,239.98. The Comptroller General, on December 10, 1946, denied each and all of the plaintiff's claims.

24. On February 3, 1947, the plaintiff filed a claim for relief, in the total amount of $96,378.04, with the FPHA pursuant to provisions of Public Law 657 of the 79th Congress, approved August 7, 1946, and Executive Order 9786, dated October 5, 1946. This administrative appeal under the Lucas Act was supplemented by letters from the plaintiff's attorney, dated February 19, 1947, May 12, 1948, and May 14, 1948.

25. The FPHA denied plaintiff's claim under the Lucas Act by letter to the plaintiff's attorney dated November 17, 1948, which reads as follows:

"Reference is made to your letter dated February 3, 1947, received in this office on February 5, 1947, filing in behalf of the Holt-Fairchild Company a claim pursuant to Public Law No. 657 for relief from losses allegedly incurred between September 16, 1940, and August 14, 1945, in the performance of six contracts with the Federal Public Housing Authority for the prefabrication, delivery and construction of 400 dwelling units at Projects Nos. Conn–6121 and Conn–6122 at East Hartford and Conn–6126 at Manchester, Connecticut. Reference is also made to the subsequent correspondence on the same subject.

"Consideration of the merits of the several items of the claims under contract terms was given in 1944 on appeal and a determination and a finding of the facts was issued by the duly authorized representative of the Head of the Department on September 26, 1944. Subsequently further consideration was given by the Contracting Officer and by the Head of the Department to the two items of claim for reimbursement of overtime wages occasioned by Executive Order No. 9301 for which direct request had been made for relief under the First War Powers Act of 1941. A determination denying relief on these two items was issued by the Head of the Department on July 19, 1945. The statement of facts in the determinations of September 26, 1944, and July 19, 1945, are substantially in accord with the facts set forth in the data submitted to support the claim for relief presented under Public Law No. 657 except for the understandable difference in amounts, one being for excess costs under the contracts and the other for out of pocket loss. In order to avoid a repetitive statement of the facts, the aforesaid findings of the facts are incorporated herein by reference.

"Among the several conditions of Public Law No. 657 and Executive Order 9786, precedent to consideration and relief under the Act, are the following:

"(1) Sec. 3, Public Law 657: 'Claims for losses * * * shall be limited to losses with respect to which a written request for relief was filed with such department or agency on or before August 14, 1945 * * *.'

944

"(2) Par. 204, Executive Order 9786: 'No claim for loss under any contract or subcontract of a war agency shall be received or considered unless a written request for relief with respect thereto was filed with such war agency on or before August 14, 1945; and no claim shall be considered if final action with respect thereto was taken on or before that date.'

"(3) Par. 307, Executive Order No. 9786: 'Relief with respect to a particular loss claimed shall not be granted under the Act and these Regulations unless the war agency * * * finds * * * that relief would have been granted under the First War Powers Act, 1941, if final action with respect thereto had been taken by the war agency on or before August 14, 1945.'

"With relation to Section 3 of Public Law No. 657 it has been ruled by competent authority that it is not sufficient that a request for some sort of relief was filed. A request for relief from a loss must definitely be a request for an amendment to a contract without consideration under the First War Powers Act. Further it was also ruled that in the light of the nature of the legislation and its history (Public Law No. 657) the regulations (Executive Order No. 9786) are in conformity with the purpose of the Act and do not conflict with it; to the contrary, they affirmatively make it workable.

"Your claim has been examined in the light of the afore-mentioned rulings. With the exception of the letters regarding the two items of overtime wages due to Executive Order No. 9301, the letters relied upon as written requests for relief prior to August 14, 1945, in compliance with Section 3 of Public Law No. 657, assert claims as a matter of contractual right. They were not intended, and there is no evidence that they were treated by either party as requests for exercise of the extraordinary powers granted by the First War Powers Act. They were not, therefore, written requests for relief upon which a claim under Public Law No. 657 may be predicated. Relative to the two items of overtime wages concerning which consideration was given under the First War Powers Act, a decision was given you under date of July 19, 1945, therefore, final action had been taken on these items prior to August 14, 1945, and they are not now for consideration.

"Insofar as this agency is concerned and considering current rulings by competent authority, the fact that all of your claims had been considered on appeal and final determinations by the Head of the Department or his duly authorized representative were issued before August 14, 1945, final disposition had been made of your claims and further consideration is not permitted to the agency in accordance with paragraph 204 of Executive Order No. 9786.

"The First War Powers Act was enacted to aid in the successful prosecution of the war and not as an aid to contractors. There was no promise to make contractors whole from losses sustained or financial difficulties encountered. Paragraph 307 of Executive Order No. 9786 requires as one of the conditions precedent to relief, that such relief would have been granted if final action had been taken prior to August 14, 1945. The fundamental bases of the claims in this case are not such that the provisions of the First War Powers Act of 1941 would be applicable and therefore no relief would have been granted had a request for war power relief been submitted by you.

"In view of the foregoing facts, it is my conclusion, and I find and determine that there is no authority within this agency to consider your claims submitted pursuant to Public Law No. 657 and, accordingly, they are denied.

"In view of the above determination, no attempt has been made to verify the accuracy of the amounts claimed and no admission as to their accuracy is to be implied by this letter."

26. There is no evidence that any action has been taken with respect to plaintiff's contracts under the Renegotiation Act, 50 U.S.C.A.Appendix, § 1191, the Contract Settlement Act of 1944, 41 U.S.C.A. § 101 et seq., or similar legislation. No relief under the Lucas Act is proposed to be granted to the plaintiff by any other department or agency of the United States.

### Conclusion of Law

Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiff is equitably entitled to the sum of $43,857.69 in settlement of its claim. Therefore, pursuant to Section 6 of the Lucas Act, 60 Stat. 902, as amended by 62 Stat. 869, 992, the Federal Public Housing Authority, National Housing Agency or its successor agency is directed to settle such claim in the amount of forty-three thousand, eight hundred fifty-seven dollars and sixty-nine cents ($43,857.69).