held otherwise, is therefore modified. As to the bank deposits and securities, plaintiff may not now rely on section 23 since the record fails to disclose whether his supplemental amended claim for refund asserted that particular section as a basis for a refund for the alleged loss of those particular items. The decision of April 7, 1953, in so far as it dealt with the bank deposits and securities, therefore, remains unchanged.

■ The next question is whether plaintiff on the merits has satisfied the requirements of 23(e) (3) in respect to the loss of the house furnishings. We have held that this loss occurred for all practical purposes on November 25, 1941, under the decree of the German Government by which all property in German controlled territories belonging to Germans of Jewish descent, who had left Germany with no intention of returning, was forfeited to the Reich. Section 23 (e) (3) permits deductions for the loss "of property not connected with the trade or business, if the loss arises from fires, storms, shipwreck, or other casualty, or from theft." Plaintiff urges that the decree referred to above resulted in a loss within the meaning of the term "or other casualty." To recover under this section, the taxpayer must prove the value of the property lost in order that the amount deductible may be satisfactorily determined. That amount is to be the lesser of the two figures: (1) The sustained loss which is the value of the property just before the casualty, or (2) the adjusted basis for determining a loss upon a sale of the property. Helvering v. Owens, 305 U.S. 468, 471, 59 S.Ct. 260, 83 L.Ed. 292.

■■ In our opinion the type of loss here claimed is not within the meaning of the term "or other casualty" as used in section 23(e) (3), but we need not therefore rest our conclusion alone on a determination of that question since the plaintiff has failed in this case to prove the value of the house furnishings at the time of the alleged loss or the cost of the furnishings, which would be the adjusted basis for nonbusiness property. See Finding 12.

We have carefully considered plaintiff's motion, for amendment of the findings as to the value of the properties alleged to have been lost, in the light of a further study of the record and find no sufficient basis for a change in the findings of fact heretofore made.

The plaintiff's motion is, therefore, denied. It is so ordered.

JONES, Chief Judge, and MADDEN and WHITAKER, Judges, concur.

**JARDINE MINING CO. v. UNITED STATES.**

**No. 48890.**

United States Court of Claims.
Sept. 30, 1953.

Russell E. Smith, Rockford, Ill., for plaintiff.

Carl Eardley, Washington, D. C., with whom was Warren E. Burger, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

HOWELL, Judge.

This suit [1] was brought under the War Contract Hardship Claims Act, known as the Lucas Act, 60 Stat. 902, as amended by 62 Stat. 869, 992, 41 U.S.C.A. § 106 note, to recover the net loss alleged to have been sustained by plaintiff in the performance of Government contracts between September 16, 1940, and August 14, 1945.

By order of the court dated March 6, 1950, the case was referred to a Commissioner for the limited purpose of taking evidence and making findings on the question of the plaintiff's request for relief. The issue now before the court for decision is whether or not the record establishes that plaintiff had on file with the department or agency concerned a request for relief within the meaning of the Act.

It is defendant's position that the documents relied on by plaintiff were not sufficient to apprise the contracting agency that it was being asked to grant plaintiff relief as a matter of grace. Fogarty v. United States, 340 U.S. 8, 71 S.Ct. 5, 95 L.Ed. 10.

Plaintiff is a mining corporation doing business in the State of Montana. In April 1942, the Bureau of Mines of the Department of the Interior wrote to plaintiff concerning the availability and cost of white arsenic ore in the vicinity of plaintiff's mines at Jardine, Montana. Plaintiff replied that all of its ore contained a concentration of from one to two percent arsenic; that it could probably produce about two million pounds of white arsenic, 99.9 percent pure, per annum, at an estimated cost of 5 cents per pound. Plaintiff stated that it had not treated its ore to recover arsenic since 1936 because of the low market price for arsenic and that it would cost approximately $15,000 to repair its equipment in order to resume arsenic production.

In May 1942, the War Production Board wrote to plaintiff and asked if plaintiff would proceed with the rehabilitation of its plant if a satisfactory arrangement could be made for the purchase of its arsenic output. In June 1943, the War Production Board wrote to the Secretary of Commerce requesting that Metals Reserve Company be authorized to negotiate with plaintiff for arsenic production for resale in accordance with allocation directives from the Chemicals Division of the War Production Board.

On June 17, 1943, plaintiff entered into a contract with Metals Reserve Company for sale and delivery to Metals Reserve of 10,000,000 pounds (5,000 tons) of re-

---

1. This case was previously before the court on defendant's motion to dismiss plaintiff's alternative causes of action. In a decision dated January 3, 1950, 88 F.Supp. 265, 115 Ct.Cl. 279, the court denied defendant's motion to dismiss the cause of action under the Lucas Act, and granted the motion with respect to plaintiff's claim for damages for breach of contract.

fined white arsenic for a total price of $600,000. The contract provided in a clause entitled "Delivery Schedule" (Finding 6) for two separate and distinct delivery periods. One-half of the contract quantity of arsenic was to be delivered within 18 months from the date of the execution of the contract, or by December 17, 1944, and the balance to be delivered within the next ensuing 12 months, or by December 17, 1945.

The contract provided that shipments were to commence on or about January 1, 1944, after completion of the mill construction and the installation of the necessary facilities, and were to be at the rate of approximately 400,000 pounds per month. It also provided:

> "However, it is hereby understood and agreed that the quantities, as set forth in the above entitled paragraph 'Delivery Schedule' shall be shipped within the periods of time, as therein specified. * * *"

A "Force Majeure" clause provided that where there was a prevention of or delay in the performance of the contract for some disabling reason beyond the control of either party, the party affected would be entitled to a suspension of the agreement. This clause also provided:

> "Nothing contained in this paragraph shall be construed to permit Seller to make up any deficiencies in the delivery schedule, contrary to the paragraph entitled 'Special Conditions.'"

The above-mentioned "Special Conditions" clause provided that time was of the essence in the contract and that any deficiencies resulting from failure by seller to deliver the arsenic called for in the first or 18-month delivery period, could not be made up by deliveries in the succeeding second or 12-month delivery period.

The contract also contained the following cancellation provision:

> "Notwithstanding any other provision hereof, Buyer may cancel this Contract, without payment of any damages or penalties for such cancellation, with respect to any material remaining undelivered after January 1, 1946."

Plaintiff borrowed $500,000 from the Smaller War Plants Corporation, the loan being secured by a mortgage upon the real and personal property of plaintiff. Metals Reserve Company consented to an assignment by plaintiff to Smaller War Plants Corporation of the proceeds to become due plaintiff under the contract.

On March 15, 1944, plaintiff wrote to Metals Reserve Company and advised that office that because of difficulties encountered in securing the necessary materials to rebuild the refined arsenic furnace, and the fact that the frozen condition of the ground made it impossible to lay the foundation, shipments of arsenic under the contract could not begin before July 1944. Pointing out that the causes of the delay were beyond the seller's control within the meaning of the contract's "Force Majeure" clause, plaintiff stated that it would require an extension of time to perform under the provisions of the contract. This letter was acknowledged by Metals Reserve on March 31, 1944, in a letter which said nothing about whether or not the extension of time would be granted, but which did state as follows:

> "You understand, of course, that these delays do not operate to alter the terms of the provisions 'Delivery Schedule' and 'Special Conditions' of the contract nor to extend the final termination date thereof."

On December 14, 1944, three days before the end of the first delivery period, plaintiff wrote to Metals Reserve Company stating that serious delays beyond the control of plaintiff had prevented delivery of all the arsenic called for in the first contract period and that all the funds borrowed from Smaller War Plants had been expended plus about $156,000 of private capital. The letter concluded with the following:

"In view of all the circumstances involved, we respectfully request that a broad and liberal interpretation be made of the provisions of the contract and that the time of delivery of the balance of the 5,000 tons of refined arsenic be extended to enable Jardine Mining Company to deliver all of the arsenic contracted for, regardless of the time involved, and without loss."

On the same day, Smaller War Plants also wrote to Metals Reserve. In that letter Smaller War Plants pointed out that under the terms of the contract, Jardine was obligated to deliver 2,500 tons of arsenic by December 17, 1944, and another 2,500 tons by December 17, 1945, "these two provisions being separate." The letter also contained the following statement:

"We are writing you this letter ahead of the expiration date for delivery of the first 2,500 tons with the hope that you will consider favorably the request of the Jardine Mining Company for a suspension of the contract for the period of time which they have lost through circumstances beyond their control. We hope the 'force majeure' clause of the contract may be interpreted so as to permit the Jardine Mining Company to complete the contract for the delivery of the 5,000 tons of arsenic as agreed upon after they have solved the metallurgical problems with which they have been confronted."

The letter also stated that unless plaintiff was permitted to deliver all the arsenic called for in the contract, the Government would lose the money loaned to plaintiff. In a similar letter of the same date to the War Production Board, Smaller War Plants noted that one-half of plaintiff's contract was about to expire and asked WPB to help in "getting the contract extended" since it was assumed that Metals Reserve would look to WPB for a recommendation. Smaller War Plants then expressed the "hope that a plan can be worked out under which the company will be permitted to carry on and produce the arsenic as called for in the contract."

On January 3, 1945, WPB wrote to plaintiff stating that its failure to fulfill the 2,500-ton portion of its contract during the first delivery period did not affect those provisions of the contract specifying purchase and delivery of a like amount during the year 1945, i. e., the second delivery period. WPB stated that it could not recommend to Metals Reserve that the contract be extended beyond the contract expiration date and into the year 1946. On January 5, 1945, Metals Reserve again wrote to plaintiff and stated that it was not inclined at that time to act favorably upon plaintiff's request of December 14, 1944, and that the terms and conditions of the contract remained in full force and effect.

As of the termination date specified in the contract, December 17, 1945, plaintiff had delivered only 127 tons of the 5,000 tons of arsenic called for. On January 4, 1946, Reconstruction Finance Corporation, as successor to Metals Reserve Company, wrote to plaintiff advising that the contract was cancelled as to the undelivered portion under the "Cancellation" provision of the contract.

It is defendant's position that plaintiff's letter of December 14, 1944 to Metals Reserve requesting that it be permitted to deliver all of the arsenic contracted for "regardless of the time involved, and without loss" is a request for an extension of time under the provisions of the contract, presumably the "Force Majeure" clause, and as such is not a request for extra-legal relief, citing Owens v. United States, 104 F.Supp. 1015, 123 Ct.Cl. 1.

Under the circumstances of this case we cannot agree with defendant's argument. Plaintiff's letter of March 15, 1944 called defendant's attention to the "Force Majeure" clause of the contract and the fact that work under the contract was going to be delayed at least four months for reasons beyond plaintiff's control. In its reply to that letter, defend-

ant warned plaintiff that such delays would not operate to alter plaintiff's obligation to deliver the specified amounts in each contract period and that any amounts not delivered in the first period might not be made up in the second. This would mean, of course, that if plaintiff did not deliver 2,500 tons in the first period, it could not under any circumstances deliver *all* of the arsenic called for under the contract.

When plaintiff wrote its later letter of December 14, 1944, the time allotted by the contract for the first period deliveries was about to expire and plaintiff had delivered only a small part of the 2,500 tons of arsenic called for in that period. Plaintiff knew that in defendant's opinion, at least, the provisions of its contract would not permit plaintiff to do what it was asking in that letter, i. e., to deliver the undelivered portions of the 2,500 tons called for in the first period during the second period so that plaintiff could ultimately deliver to defendant all of the 5,000 tons called for in the contract. Plaintiff had not previously disputed defendant's interpretation of the "Special Conditions" clause in the contract and it did not, in the letter of December 14, 1944, contend that such interpretation was wrong. We think that in asking for a "broad and liberal interpretation" of the contract to the end that all of the 5,000 tons of arsenic might be delivered, plaintiff was asking defendant to waive the contract requirements contained in the "Special Conditions" clause. This same impression is gained from the letter of December 14, 1944, from Smaller War Plants to WPB in which it was stated that the writer *hoped* that a *plan* might be worked out whereby *all* the arsenic contracted for might be delivered.

By December 1944, there was apparently no question in the minds of anyone concerned but that plaintiff would suffer losses if it was prevented from delivering all the arsenic called for. The total contract price was $600,000. As of December 14, 1944, plaintiff had expended all of the $500,000 Smaller War Plants loan and an additional $156,000 of private capital in its attempts to fulfill the contract. Plaintiff so advised defendant in the December 14th letter.

In the Owens case, supra, relied on by defendant, the contractor was clearly entitled to the extensions of time requested under the provisions of his contract and the extensions asked for were in fact granted by defendant as relief under the contract. In the instant case, the letters of December 14, 1944 were written to defendant after defendant had stated that no circumstances would permit the delivery during the second delivery period of arsenic which should have been delivered in the first. We need not decide whether, had plaintiff asked for an extension of time for the first delivery period (which was 18 months), they would have been entitled to it under the provisions of the "Force Majeure" clause. What plaintiff did ask for in the December 14th letter was that it be permitted to deliver the balance of the first-period arsenic during the second period and that it be allowed to deliver *all* the arsenic called for by the contract regardless of when. We think that under no valid interpretation of the contract could this be considered a request for legal or contract relief.

Under the Government's interpretation of plaintiff's contract, particularly the "Special Conditions" clause, the only way it could have allowed plaintiff to do what it wished, was by a modification of the contract without consideration. This defendant might have done had it felt that such modification would benefit the Government in its efforts to further the prosecution of the war. It is clear from defendant's later letters that defendant did not believe such an amendment would be of benefit to the war effort since in WPB's letter of January 3, 1945 to Smaller War Plants, WPB noted that the arsenic supply and demand situation was fairly well in balance for the year 1945, and this meant that there might well be no necessity for the delivery of even a

substantial portion of the arsenic contracted for. (Finding 19.)[2]

Under all the circumstances, we think defendant was clearly on notice by plaintiff's letter of December 14, 1944, that plaintiff was requesting relief outside the terms of its contract and as a matter of grace. Accordingly, plaintiff had on file with a war contracting agency of defendant, prior to August 14, 1945, a request for relief from losses within the meaning of Section 3 of the Lucas Act.

Plaintiff is equitably entitled to recover from defendant in settlement of its claim an amount to be determined in further proceedings before a commissioner of this court under Rule 38(c), 28 U.S. C.A.

JONES, Chief Judge, and MADDEN, WHITAKER and LITTLETON, Judges, concur.

**UNION PAVING CO. v. UNITED STATES.**

**No. 48241.**

United States Court of Claims.

Oct. 6, 1953.

---

2. In our earlier decision herein, 88 F. Supp. 265, 115 Ct.Cl. 279, we held that defendant's cancellation of the contract in January 1946 as to the undelivered portions thereof, was not a breach of contract.